**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION** | **MDL 2724**<br>**16-MD-2724** |
| | **HON. CYNTHIA M. RUFE** |
| **THIS DOCUMENT RELATES TO:** | |
| **IN RE: CLOBETASOL CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-CB-27240**<br>**16-CB-27241, 16-CB-27242,**<br>**16-CB-27243** |
| **IN RE: DIGOXIN CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-DG-27240**<br>**16-DG-27241,16-DG-27242,**<br>**16-DG-27243** |
| **IN RE: DIVALPROEX ER CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-DV-27240**<br>**16-DV-27241,16-DV-27242,**<br>**16-DV-27243** |
| **IN RE: DOXYCYCLINE CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-DX-27240**<br>**16-DV-27241,16-DX-27242,**<br>**16-DX-27243** |
| **IN RE:  ECONAZOLE CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-EC-27240**<br>**16-EC-27241,16-EC-27242,**<br>**16-EC-27243** |
| **IN RE: PRAVASTATIN CASES**<br>*All Direct Purchaser, End-Payer, and Indirect Reseller Actions* | **16-PV-27240**<br>**16-PV-27241,16-PV-27242,**<br>**16-PV-27243** |

## OPINION

**Rufe, J.**                                                                                                  **October 16, 2018**

This multidistrict antitrust litigation alleges that certain pharmaceutical companies

engaged in an unlawful scheme or schemes to fix, maintain and stabilize prices, rig bids, and

engage in market and customer allocations of certain generic pharmaceutical products.  In this

Opinion, the Court considers Defendants'[1] joint and individual motions to dismiss the Sherman Act claims[2] in the operative consolidated class action complaints brought on behalf of the Direct Purchaser Plaintiffs ("DPPs"), the End-Payer Plaintiffs ("EPPs"), and the Indirect-Reseller Plaintiffs ("IRPs") (hereinafter collectively referred to as the "Class Plaintiffs"[3]) with respect to the following drugs: (1) clobetasol[4]; (2) digoxin[5]; (3) divalproex ER[6]; (4) doxycycline[7]; (5) econazole[8]; and (6) pravastatin[9] (collectively, the "Group 1" drugs). The Court's Opinion also considers pending motions to dismiss by certain individual Defendants. For the reasons set forth below, the motions will be granted in part and denied in part.

## I.      BACKGROUND

Defendants are alleged to have engaged in conduct that "subvert[ed] the operation of a

---

[1] All of the Defendants relevant to the motions decided in this Opinion are further identified below.

[2] To the extent that Group 1 Defendants move to dismiss the state law claims brought on behalf of the Group 1 EPPs and IRPs, the Court will address these motions in a separate Opinion and Order.

[3] These parties assert putative class action claims but no motions for class certification have been filed and the references in this Opinion to Class Plaintiffs are simply to distinguish them from other Plaintiff groups.

[4] Clobetasol DPPs assert claims with respect to the prices for multiple clobetasol formulations including varying strengths of cream, gel, ointment, and topical solutions. *See* CB DPP Compl. ¶¶ 72-95.

[5] Digoxin DPPs assert claims with respect to the prices for 0.125 mg tablets and 0.25 mg tablets. *See* DG DPP Compl. ¶¶ 67-82.

[6] Divalproex DPPs assert claims with respect to the prices for 250 mg and 500 mg extended release tablets. *See* DV DPP Compl. ¶¶ 66-78.

[7] In their consolidated amended class action complaint, Doxycycline DPPs assert claims with respect to the prices for doxycycline hyclate regular release ("Doxy RR") in 50 mg and 100 mg capsules and 100 mg tablets. *See* DX DPP Compl. ¶¶ 71-92. Doxycycline DPPs also assert claims for a scheme with respect to the prices of doxycycline delayed release formulations ("Doxy DR"), although they do not allege specific price increases for Doxy DR. *See id.* at ¶¶ 8, 106-13.

[8] Econazole DPPs assert claims with respect to the prices for econazole nitrate cream in 15 gm, 30 gm, and 85 gm strengths. EC DPP Compl. ¶ 63-77.

[9] Pravastatin DPPs assert claims with respect to the prices for 10 mg, 20 mg, 40 mg, and 80 mg pravastatin tablets. *See* PV DPP Compl. ¶¶ 65-89.

competitive marketplace for generic pharmaceuticals."[10]  Class Plaintiffs contend Defendants

engaged in anticompetitive conduct that was part of a larger conspiracy or series of conspiracies

involving many generic pharmaceutical manufacturers and many generic pharmaceuticals.[11]

Group 1 DPPs specifically allege Defendants "and co-conspirators engaged in an overarching

anticompetitive scheme in the market for [each Group 1 drug] to artificially inflate prices

through unlawful agreements."[12]  In support of their claims, Group 1 DPPs' complaints include

allegations "based on information made public during ongoing government investigations of

Defendants and other generic pharmaceutical companies for alleged unlawful price-fixing and

other conduct in the generic pharmaceutical industry"[13] and Group 1 EPPs and IRPs contend

these investigations "have uncovered the existence of a broad, well-coordinated and long-

running series of schemes to fix the prices and allocate markets for a number of generic

pharmaceuticals in the United States."[14]

### A.    PUTATIVE CLASS ACTION COMPLAINTS

On August 5, 2016, the United States Judicial Panel on Multidistrict Litigation ("JPML")

transferred "for coordinated or pretrial proceedings" putative class "actions shar[ing] factual

---

[10] *See* CB DPP Compl. ¶ 3; DG DPP Compl. ¶ 3; DV DPP Compl. ¶ 3; DX DPP Compl. ¶ 3; EC DPP Compl. ¶ 3.

[11] CB DPP Compl. ¶ 3; DG DPP Compl. ¶ 3; DV DPP Compl. ¶ 3; DX DPP Compl. ¶ 3; EC DPP Compl. ¶ 3; PV DPP Compl. ¶ 3; CB EPP Compl. ¶ 8; DG EPP Compl. ¶ 5; DV EPP Compl. ¶ 8; DX EPP Compl. ¶ 4; EC EPP Compl. ¶ 4; PV EPP Compl. ¶ 9; CB IRP Compl. ¶ 4; DG IRP Compl. ¶4; DV IRP Compl. ¶ 2; DX IRP Compl. ¶ 3; EC IRP Compl. ¶ 4; PV IRP Compl. ¶ 9.

[12] CB DPP Compl. ¶ 7; DG DPP Compl. ¶ 7; DV DPP Compl. ¶ 7; EC DPP Compl. ¶ 7; PV DPP Compl. ¶ 7; s*ee also* DX DPP Compl. ¶ 7 (alleging "an overarching anticompetitive scheme in at least the market for Doxycycline Regular Release").

[13] CB DPP Compl. ¶ 4; DG DPP Compl. ¶ 4; DV DPP Compl. ¶ 4; DX DPP Compl. ¶ 4; EC DPP Compl. ¶ 4; PV DPP Compl. ¶ 4.

[14] CB EPP Compl. ¶ 25; DG EPP Compl. ¶ 25; DV EPP Compl. ¶ 25; DX EPP Compl. ¶ 29; EC EPP Compl. ¶ 25; PV EPP Compl. ¶30; CB IRP Compl. ¶ 25; DG IRP Compl. ¶ 22; DV IRP Compl. ¶ 162; DX IRP Compl. ¶ 206; EC IRP Compl. ¶ 23; PV IRP Compl. ¶ 28 (internal quotation marks omitted).

questions arising from allegations that defendants, all of which are manufacturers of generic

pharmaceuticals, conspired to fix the prices of" digoxin and doxycycline.[15] The JPML then

expanded the scope of the MDL on April 6, 2017,

> to include actions in which: (a) plaintiffs assert claims for price fixing of generic
> drugs in violation of the Sherman Act and/or state antitrust laws on behalf of
> overlapping putative nationwide classes of direct or indirect purchasers of generic
> pharmaceuticals; (b) the average market price of the subject generic
> pharmaceutical is alleged to have increased between 2012 and the present;
> (c) defendants are alleged to have effectuated the alleged conspiracy through
> direct company-to-company contacts and through joint activities undertaken
> through trade associations, in particular meetings of the Generic Pharmaceutical
> Association; and (d) the allegations stem from the same government investigation
> into anticompetitive conduct in the generic pharmaceuticals industry.[16]

In expanding the MDL's scope to include additional putative class actions, the JPML reasoned

that "[a]lthough separate conspiracies are alleged, they may overlap significantly," noting that

the allegations in all the initial cases in the MDL and in the additional actions "stem from the

same government investigation into price fixing, market allocation, and other anticompetitive

conduct in the generic pharmaceuticals industry."[17] The JPML explained that, as in the digoxin

and doxycycline actions, Plaintiffs in the additional putative class action cases

> allege[d] that, between 2012 and 2015, the average market price for these generic
> drugs underwent significant increases that corresponded with meetings of trade
> associations, in particular those of the Generic Pharmaceutical Association.
> Indeed, many of the complaints identify the same trade association meetings and
> name overlapping generic pharmaceutical manufacturers as defendants.[18]

Despite these overlaps, for the drugs relevant to this Opinion the DPPs, EPPs, and IRPs

are currently proceeding with claims set forth in multiple separate complaints, each of which is

---

[15] *In re Generic Drug Pricing Antitrust Litig.*, 227 F. Supp. 3d 1402, 1403-04 (J.P.M.L. 2016).

[16] *In re Generic Digoxin & Doxycycline Antitrust Litig.*, 222 F. Supp. 3d 1341, 1344 (J.P.M.L. 2017).

[17] *Id.* at 1343.

[18] *Id.*

focused on an alleged conspiracy regarding one generic drug (although each complaint addresses claims pertaining to multiple strengths and/or formulations of the same drug).[19]  As noted, this Opinion addresses the six Group 1 drugs.[20]

## B.  THE BROADER MDL

The putative class actions are not the only cases in this MDL.  On August 3, 2017, the JPML transferred into this MDL an antitrust enforcement action first filed by 40 states—the State Plaintiffs[21]—against six pharmaceutical manufacturers relating to Doxy DR and

---

[19] On June 7, 2018, EPPs filed a related class action complaint alleging an overarching conspiracy resulting in overcharges due to an unlawful agreement among defendants (including some not named here) to allocate customers, rig bids, and fix, raise, and/or stabilize the prices of certain forms of the following generic pharmaceutical drugs: acetazolamide, doxycycline hyclate, doxycycline monohydrate, fosinopril-hydrochlorothiazide, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.  *See 1199SEIU National Benefit Fund v. Actavis Holdco US, Inc.*, Civil Action No. 18-2401 (E.D. Pa.), Doc. No. 1 at ¶¶ 1-2.  The overarching EPP complaint asserts that "the allegations in EPPs' Doxycycline Complaint also relate to and are a part of the overarching conspiracy alleged herein" but notes that "given the advanced procedural posture of that case Plaintiffs propose for the sake of judicial efficiency to keep that case [(the case addressed in this Opinion)] on an individual track at least until motions to dismiss are resolved." *Id.* at ¶ 3 n.17.  Of the Group 1 Defendants, the Hi-Tech Defendants, Impax, Lupin, Teligent, and the Wockhardt Defendants are not named as defendants in the overarching EPP complaint.

Similarly, on June 18, 2018, IRPs filed a related class action complaint alleging "an overarching conspiracy among defendant generic drug manufacturers to maintain and raise prices and to allocate customers and markets in order to assign each defendant manufacturer its "fair share" of business while keeping prices high." *See West Val Pharmacy v. Actavis Holdco U.S., Inc.*, Civil Action. No. 18-2533 (E.D. Pa.), Doc. No. 1 at ¶ 2.  The drugs at issue in the overarching IRP complaint are the same as those identified in the overarching EPP complaint. *Id.* at ¶ 3. Relevant here, the overarching IRP complaint explains that, "[i]n the interests of MDL case management, because Plaintiffs' previously-filed claims regarding Doxycycline Hyclate are currently pending a motion to dismiss, the Doxycycline Hyclate allegations are 'at issue' herein only as part of the overarching conspiracy; they do not supersede the drug-specific claims in the previously-filed complaint." *Id.* at ¶ 4.  Of the Group 1 Defendants, the Hi-Tech Defendants, Impax, Lupin, Teligent, and the Wockhardt Defendants are not named as defendants in the overarching IRP complaint.

[20] In order to promote the efficient management of this MDL and for purposes of briefing on motions to dismiss the putative class action complaints, the Court divided the Class Plaintiffs' claims into three different case management groups. *See* Pretrial Order No. 28 (MDL Doc. No. 388).  Group 2 comprises the Class Plaintiffs' claims specific to the following drugs:  (1) albuterol; (2) baclofen; (3) clomipramine; (4) desonide; (5) propranolol; and (6) ursodiol.  Group 3 comprises the Class Plaintiffs' claims specific to:  (1) amitriptyline; (2) benazepril HCTZ; (3) fluocinonide; (4) glyburide; (5) levothyroxine; and (6) lidocaine/prilocaine.

[21] The State Plaintiffs now include forty-eight States (Connecticut, Alabama, Alaska, Arizona, Arkansas, California (which asserts only state-law claims), Colorado, Delaware, Florida, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming) along with the District of Columbia and the Commonwealth

glyburide.[22]  "[T]he States do not assert class claims, but rather proceed individually or on a *parens patriae* basis."[23]  In transferring the State Plaintiffs' action, the JPML explained that

> the States: assert claims for price fixing of generic drugs (specifically, doxycycline hyclate delayed release and glyburide) in violation of the Sherman Act and state antitrust laws; allege that the average market price of these pharmaceutical products increased between 2012 and the present; and allege that defendants effectuated the alleged conspiracy through direct company-to-company contacts and through joint activities undertaken through trade associations. The States' claims, like those of the private plaintiffs, stem from the same government investigation into anticompetitive conduct in the generic pharmaceuticals industry.[24]

Now, the State Plaintiffs are proceeding on a single consolidated amended complaint that raises claims pertaining to an alleged overarching conspiracy that was effectuated by a series of interrelated conspiracies across a broader market for a number of generic drugs.[25]  Their single operative complaint specifically implicates fifteen generic drugs:  acetazolamide, Doxy DR,

---

of Puerto Rico.  *See* Civil Action No. 17-3768.

[22] *See In re Generic Pharm. Pricing Antitrust Litig.*, No. MDL 2724, 2017 WL 4582710, at *1 (J.P.M.L. Aug. 3, 2017) (denying motion to vacate an order that conditionally transferred the State Plaintiffs' action into this MDL).

[23] *Id.*

[24] *Id.* at *2*; see also id.* at *1 ("There will be significant overlap in the factual and legal issues presented by the actions currently in the MDL and the State Action. As all arise from the same factual core, they will involve common discovery of defendants and third parties.").

[25] More specifically, in their consolidated amended complaint, the State Plaintiffs allege, inter alia, that

> The overarching conspiracy among generic manufacturers . . . —which ties together all of the agreements on individual drugs identified in this Complaint—is an agreement that each competitor is entitled to its [REDACTED] of the market, whether the market is a particular generic drug, or a number of generic drugs. . . .  This collusive methodology has evolved over time during the numerous in-person meetings, telephonic communications and other interactions between generic manufacturers about specific drugs over the course of several years, . . . .  This overarching agreement is widespread across the generic drug industry and is . . . broader than the Defendants named in this Complaint. . . .  [W]hen necessary, the larger understanding was reinforced through phone calls and text messages between the Defendants to discuss fair share and the desire to maintain or raise prices with respect to specific drugs. These types of communications occur with great frequency across the industry, including among Defendants.

*In re Generic Pharmaceuticals Pricing Antitrust Litig. (State Attorneys General Litig.),* Civil Action No. 17-cv-3768. Doc. No. 14 at ¶¶ 90-93.

Doxy Mono, fosinopril-hydrochlorothiazide, glipizide-metformin, glyburide, glyburide-metformin, leflunomide, meprobamate, nimodipine, nystatin, paromomycin, theophylline, verapamil, and zoledronic acid.[26]  Of these, only Doxy DR and glyburide (a Group 3 drug) are also implicated in the Class Plaintiffs' individual actions.

Also part of this MDL is a direct action complaint that was filed in this Court on January 22, 2018, on behalf of three companies that own and operate retail grocery stores and pharmacies:  The Kroger Co.; Albertsons Companies, LLC; and H.E. Butt Grocery Company L.P. ("Direct Action Plaintiffs").  Direct Action Plaintiffs allege an overarching antitrust conspiracy related to thirty drugs (both the drugs named by Class Plaintiffs and the drugs identified in the State Plaintiffs' consolidated amended complaint).[27]  Humana, Inc., an insurance company, filed a separate direct action complaint related to this MDL on August 3, 2018, alleging a "a broad, overarching conspiracy to inflate the prices of . . . generic drug portfolios en masse."[28]  Additionally, on September 25, 2018, Marion Diagnostic Center, LLC and Marion Healthcare LLC filed a putative class action complaint alleging "an overarching generic conspiracy," with allegations that drug manufacturer Defendants "have enlisted tacitly or explicitly distributor McKesson as a cooperating co-conspirator (and possibly other unnamed distributors) to aid and conceal their price fixing and market allocation across the generic drug industry."[29]

---

[26] *See id.* at ¶ 1.

[27] *See The Kroger Co. v. Actavis Holdco U.S., Inc.*, Civil Action No. 18-284 (E.D. Pa.), Doc. No. 1.

[28] *See Humana, Inc. v. Actavis Elizabeth, LLC*, Civil Action No. 18-3299 (E.D. Pa.), Doc. No.1.  The Humana complaint alleges a conspiracy relevant to prices for the following sixteen drugs:  amitriptyline; baclofen; benazepril; clobetasol; clomipramine; digoxin; divalproex; doxycycline; leflunomide; levothyroxine; lidocaine; nystatin; pravastatin; propranolol; ursodiol; and verapamil.  *Id.* at ¶¶ 18-33.

[29] *See Marion Diagnostic Center LLC v. McKesson Corp.*, Civil Action No. 18-4137 (E.D. Pa.), Doc. No. 1, at ¶ 7.  This complaint encompasses the drugs named in the State Plaintiffs' amended complaint, among others. *Id.* at ¶ 4.

### C. CLASS PLAINTIFFS NAMED IN THE GROUP 1 COMPLAINTS

Three types of Class Plaintiffs have emerged from the generic pharmaceutical supply chain to assert claims on behalf of overlapping putative nationwide classes of purchasers of the generic drugs included in this litigation.

As their group name implies, the Direct Purchaser Plaintiffs – DPPs – allege they directly purchased generic pharmaceuticals from Defendants. They include drug purchasing cooperatives and retail pharmacy operators. The Group 1 DPPs, who each assert claims with respect to all of the Group 1 drugs, are identified in the following table:

| GROUP 1 CASES<br>Direct Purchaser Plaintiffs: | Clobetasol | Digoxin | Divalproex ER | Doxycycline | Econazole | Pravastatin |
|---|---|---|---|---|---|---|
| Ahold USA, Inc. | x | x | x | x | x | x |
| César Castillo, Inc. | x | x | x | x | x | x |
| FWK Holdings, L.L.C. | x | x | x | x | x | x |
| KPH Healthcare Services, Inc., a/k/a Kinney Drugs, Inc. | x | x | x | x | x | x |
| Rochester Drug Co-Operative, Inc. | x | x | x | x | x | x |

DPPs assert claims against Defendants only for price fixing in violation of the Sherman Act. They seek relief including an adjudication that the acts alleged in their complaints "constitute unlawful restraints of trade in violation of the Sherman Act," and "[a] judgment against Defendants, jointly and severally, for the damages sustained by Plaintiffs and the Class defined herein, and for any additional damages, penalties, and other monetary relief provided by applicable law, including treble damages."[30]

The End-Payer Plaintiffs – EPPs – are third party payors (including employee welfare benefits funds, labor unions, and private insurers) and individual plaintiffs who either allege that they indirectly purchased generic pharmaceuticals manufactured by one or more Defendants or that they provided reimbursements for the drugs. As set forth in the table below, the Group 1

---

[30] *See, e.g.*, CB DPP Compl. § X, ¶ B-C.

EPPs do not each assert claims with respect to all of the pharmaceutical products implicated in the Group 1 cases.

| GROUP 1 CASES<br>End-Payer Plaintiffs: | Clobetasol | Digoxin | Divalproex ER | Doxycycline | Econazole | Pravastatin |
|---|---|---|---|---|---|---|
| American Federation of State, County and Municipal Employees District Council 37 Health & Security Plan | x | x | x | x | x | x |
| Detectives Endowment Association of the City of New York | | x | | x | x | |
| Nina Diamond | | x | | | | |
| Hennepin County | x | | | | | |
| International Union of Operating Engineers Local 30 Benefits Fund | | | | x | | |
| Robby Johnson | | | | | | x |
| Louisiana Health Service & Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana and HMO Louisiana, Inc. | x | x | x | x | x | x |
| Ottis McCrary | | | | x | | |
| Philadelphia Federation of Teachers Health and Welfare Fund | | | x | | | |
| The City of Providence Rhode Island | | x | | | x | x |
| Sergeants Benevolent Association of the Police Department of the City of New York Health and Welfare Fund | x | | | | x | x |
| Self-Insured Schools of California | x | x | x | x | x | x |
| David Sherman | | | | | | x |
| Twin Cities Pipe Trades Welfare Fund | | x | | | | |
| UFCW Local 1500 Welfare Fund | | | | x | | |
| Uniformed Fire Officers Association Family Protection Plan Local 854 | x | | | | | |
| Unite Here Health | x | x | x | x | x | x |
| United Food & Commercial Workers and Employers Arizona Health and Welfare Trust | | | | | x | |
| Valerie Velardi | | | | x | | |
| 1199SEIU National Benefit Fund | x | | x | | | |
| 1199SEIU Greater New York Benefit Fund | x | | x | | | |
| 1199SEIU National Benefit Fund for Home Care Workers | x | | x | | | |
| 1199SEIU Licensed Practical Nurses Welfare Fund | x | | x | | | |

The Indirect Reseller Plaintiffs – IRPs – are independent pharmacies that allege they acquire drugs indirectly through drug wholesalers rather than directly from drug manufacturers. The Group 1 IRPs each assert claims with respect to all of the pharmaceutical products included in the Group 1 cases and are identified in the following table.

| GROUP 1 CASES<br>Indirect Reseller Plaintiffs: | Clobetasol | Digoxin | Divalproex ER | Doxycycline | Econazole | Pravastatin |
|---|---|---|---|---|---|---|
| Chet Johnson Drug, Inc. | x | x | x | x | x | x |
| Deal Drug Pharmacy | x | x | x | x | x | x |
| Falconer Pharmacy, Inc. | x | x | x | x | x | x |
| Halliday's & Koivisto's Pharmacy | x | x | x | x | x | x |
| Russell's Mr. Discount Drugs, Inc. | x | x | x | x | x | x |
| West Val Pharmacy | x | x | x | x | x | x |

Like the DPPs, the EPPs and IRPs assert Sherman Act claims. However, they do not seek to recover damages for their Sherman Act claims. Instead, they assert that they "are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged" in their complaints.[31] In addition, the EPPs and the IRPs assert claims under various state antitrust laws, as well as state law consumer protection claims and/or claims for unjust enrichment. It is for these claims that they seek to recover monetary damages.[32]

## D. DEFENDANTS NAMED IN THE GROUP 1 COMPLAINTS

Defendants are pharmaceutical manufacturers. No Defendant named in a Group 1 case manufactured all of the pharmaceutical products included in the Group 1 cases. Several of the

---

[31] *See, e.g.*, CB EPP Compl. ¶ 249; CB IRP Compl. ¶ 240. As indirect purchasers, EPPs and IRPs are barred from recovering monetary damages for their federal antitrust claims. *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 366 n.2 (3d Cir. 2005) ("Illinois Brick determined that direct purchasers are the only parties 'injured' in a manner that permits them to recover damages. It thus held that indirect purchaser plaintiffs do not have statutory standing to recover damages under Section 4 of the Clayton Act.").

[32] For example, CB EPPs seek to "recover damages, to the maximum extent allowed under such state laws" and a judgment "against Defendants, jointly and severally in an amount to be trebled to the extent such laws permit" in addition to "damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained." *See, e.g.* CB EPP Compl. § XV, ¶¶ 3-4. Similarly, CB IRPs seek to "recover damages, to the maximum extent allowed by [the relevant state] laws, in the form of restitution and/or disgorgement of profits unlawfully obtained." CB IRP Compl. § XIV, ¶ D. This Opinion does not address the state law claims.

Defendants named in the Group 1 cases have manufactured only one of the pharmaceutical products included in this group of cases, while others have manufactured two or more of the pharmaceutical products included in this MDL. The Group 1 Defendants are identified in the following table.

| GROUP 1 CASES Defendants: | Clobetasol | Digoxin | Divalproex ER | Doxycycline | Econazole | Pravastatin |
|---|---|---|---|---|---|---|
| Actavis Holdco U.S., Inc. and Actavis Pharma, Inc.[33] ("Actavis") | x | | | x | | |
| Akorn, Inc., and Hi-Tech Pharmacal, Co., Inc. (acquired by Akorn, Inc. in August 2013) (collectively, "Hi-Tech Defendants"), Akorn Sales, Inc.[34] | x | | | | | |
| Apotex Corp. ("Apotex") | | | | | | x |
| Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's") | | | x | | | |
| Glenmark Pharmaceuticals Inc., USA ("Glenmark") | | | | | | x |
| Heritage Pharmaceuticals, Inc. ("Heritage") | | | | x | | |
| Impax Laboratories, Inc. ("Impax") | | x | | | | |
| Lannett Company, Inc. ("Lannett") | | x | | | | |
| Lupin Pharmaceuticals, Inc. ("Lupin") | | | | | | x |
| Mayne Pharma USA, Inc. ("Mayne") | | | | x | | |
| Mylan, Inc. and Mylan Pharmaceuticals, Inc. (collectively, "Mylan Defendants") | | x | x | x | | |
| Par Pharmaceutical, Inc. ("Par")[35] | | x | x | x | | |
| Perrigo New York, Inc. ("Perrigo") | x | | | | x | |
| Sandoz, Inc. and its wholly owned subsidiary, Fougera Pharmaceuticals, Inc. (collectively, "Sandoz Defendants") | x | | | | | x |
| Sun Pharmaceutical Industries, Inc. ("Sun")[36] | | | | x | | |

[33] Actavis Pharma, Inc. is named as a defendant in the clobetasol EPP complaint, *see* CB EPP Compl. ¶ 45, but not in the clobetasol DPP or IRP complaints.

[34] Akorn Sales, Inc. is named as a defendant in the clobetasol EPP complaint, *see* CB EPP Compl. ¶ 48, but not in the clobetasol DPP or IRP complaints.

[35] Par "is a subsidiary of Endo International plc ("Endo") . . . . [I]n August 2014, Endo acquired DAVA Pharmaceuticals, Inc. ("DAVA") and folded DAVA into Par." DX DPP Compl. ¶ 35. Doxycycline DPPs refer to Endo, DAVA and Par collectively as "Par." *Id.*

[36] Doxycycline DPPs allege that URL Pharma, Inc. ("URL"), "a wholly owned-subsidiary of Sun," was

| | | | | | | |
|---|---|---|---|---|---|---|
| Taro Pharmaceuticals USA, Inc. ("Taro")[37] | x | | | | x | |
| Teligent, Inc. ("Teligent") | | | | | x | |
| Teva Pharmaceuticals USA, Inc. ("Teva") | | | | | | x |
| West-Ward Pharmaceuticals Corp. | | x | | x | | |
| Morton Grove Pharmaceuticals Inc., and its wholly owned subsidiary Wockhardt, USA LLC (collectively, "Wockhardt Defendants") | x | | | | | |
| Zydus Pharmaceuticals (USA) Inc. ("Zydus") | | | x | | | x |

Further background regarding the "doxycycline" Defendants is required. Although Group 1 Plaintiffs' claims relate broadly to "doxycycline hyclate," the drug "is available . . . in different formulations, like regular release and delayed release . . . ."[38] Doxycycline Class Plaintiffs acknowledge a possible distinction between the alleged pricing schemes for Doxy RR and Doxy DR.[39] For example, doxycycline DPPs allege that "[a]t least Defendants Actavis, Par, Sun, and West-Ward" engaged in a scheme with respect to Doxy RR.[40] They then contend that "at least Defendants Heritage, Mayne, and Mylan" engaged in a scheme with respect to the prices of Doxy DR.[41] There is limited overlap between the Doxy RR and Doxy DR Defendants, as summarized in the following table:

---

acquired by Sun in late 2012. *Id.* at ¶ 36. Doxycycline EPPs allege that Mutual Pharmaceutical Company, Inc. was a subsidiary of URL also acquired by Sun. DX EPP Compl. ¶¶ 53-54.

[37] Clobetasol IRPs allege that Sun Pharmaceutical Industries acquired a controlling stake in Taro Pharmaceutical Industries, Ltd. in 2010. CB IRP Compl. ¶ 48. Similarly, Clobetasol EPPs allege that "Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Sun Pharmaceutical Industries, Ltd., an[ ] Indian entity." CB EPP Compl. ¶ 55.

[38] DX DPP Compl. ¶ 6.

[39] A third formulation of doxycycline, doxycycline monohydrate ("Doxy Mono"), is not specifically implicated in the DPP, EPP, or IRP complaints. However, it is implicated elsewhere in this MDL.

[40] *See* DX DPP Compl. ¶ 7.

[41] *Id.* at ¶¶ 8; *see also id.* at ¶¶ 106-13.

| Doxycycline Defendants: | Doxy RR | Doxy DR |
|---|---|---|
| Actavis | x | |
| Heritage | | x |
| Mayne | | x[42] |
| Mylan[43] | x[44] | x[45] |
| Par[46] | x | |
| Sun | x | |
| West-Ward. | x | |

Regardless, the doxycycline Plaintiffs' complaints do not consistently distinguish between their claims with respect to Doxy RR and Doxy DR.[47]

## E.    ALLEGED PRICE INCREASES

Group 1 Plaintiffs allege that the drugs relevant to their claims underwent a dramatic price increase at some point in time between 2012 and 2014:  doxycycline in November 2012,[48]

---

[42] Mayne entered the Doxy DR market in February 2014.  *Id.* at ¶ 110.

[43] Group 1 Plaintiffs contend Mylan also manufactured Doxy Mono.  *See* DX DPP Opp. Br. at 6.

[44] Doxycycline Plaintiffs' complaints do not explicitly allege that Mylan produced Doxy RR.  *See, e.g.,* DX DPP Compl. ¶ 74 ("During the Class Period, Defendants Actavis, Par, Sun and West-Ward dominated Doxycycline Regular Release sales . . . .").  However, in their response to Defendants' motions to dismiss their complaint, the Doxycycline DPPs assert that Mylan participated in the alleged schemes to fix both the prices of Doxy RR and Doxy DR, noting that it had a "later entry" into the Doxy RR scheme.  DX DPP Response Br. at 6 n.2.  In its individual motion to dismiss, Mylan concedes that it has produced Doxy RR, but contends that it was not in the Doxy RR market when Doxy RR prices are first alleged to have increased.  *See* DX Mylan Response Br. at 2 ("Mylan was not in the Doxy RR market at all when the alleged unlawful price increases occurred in 2012, and only entered [later].").

[45] "Before the Doxycycline DR Class Period, Mylan was the only manufacturer of generic Doxycycline DR and had 100% of generic sales." DX DPP Compl. ¶ 103.

[46] Group 1 Plaintiffs contend Par also manufactured Doxy Mono.  *See* DX DPP Opp. Br. at 6.

[47] *See, e.g.,* DX IRP Compl. ¶ 1 n.1 ("Doxycycline Regular Release and Doxycycline DR are together referred to as 'Doxycycline.'").

[48] *See* DX DPP Compl. ¶ 77 (alleging Defendants' effective prices for Doxy RR "inexplicably increased sharply beginning in November 2012"); *see also* DX EPP Compl. ¶¶ 80-96 (citing data showing price increases for doxycycline manufactured by Doxy RR manufacturers Actavis, West-Ward, and Sun, alleging Par "priced at a supracompetitive level comparable to the other Defendants," and not alleging specific pricing data for Doxy DR manufacturers Heritage, Mayne or Mylan); DX IRP Compl. ¶ 77 (describing a price increase for "50mg and 100mg capsules of doxycycline hyclate manufactured and/or distributed by Defendants Actavis, Mylan, Westward [sic] and Sun (Mutual) and by Qualitest (predecessor in interest of Defendant Par" with a graph showing that Mylan was a later entrant into the market ).

pravastatin in May 2013,[49] divalproex in June 2013,[50] digoxin in October 2013,[51] clobetasol in June 2014,[52] and econazole in July 2014.[53] They assert that the alleged price increases were so large in magnitude that they would not have been implemented by "a rational company . . . unless certain that its ostensible competitors would follow."[54] Group 1 Plaintiffs contend that the price increases were "the result of an agreement among Defendants," with most alleging there was an agreement "to increase pricing and restrain competition for the sale of [the relevant drug] in the United States."[55] Group 1 DPPs contend the scale of the price increases "differentiates

---

[49] *See* PV DPP Compl. ¶ 65.

[50] *See* DV DPP Compl. ¶ 66.

[51] *See* DG DPP Compl. ¶ 67.

[52] *See* CB DPP Compl. ¶ 72.

[53] *See* EC DPP Compl. ¶ 63.

[54] CB DPP Compl. ¶ 207(9); DG DPP Compl. ¶ 218(8); DV DPP Compl. ¶ 174(8); DX DPP Compl. ¶ 232(7); EC DPP Compl. ¶ 172(8); PV DPP Compl. ¶ 195(9); *see also* CB EPP Compl. ¶ 111 ("increasing prices would be economically irrational for a single Defendant, but increasing prices together as a result of collusion, however, proved extremely profitable for Defendants"); DG EPP Compl. ¶ 145 ("Such extreme price moves are not rational in the absence of advance knowledge that competitors will join the increase."); DV EPP Compl. ¶ 6 ("Because purchasers choose whose Divalproex ER product to buy based primarily on price, and unilateral price increases generally result in loss of market share, it would have been economically irrational for any one Defendant to dramatically raise its prices without assurance that its competitors would do the same."); DX EPP Compl. ¶ 176 ("But here the increases are extreme – jumping as much as 8200% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase."); EC EPP Compl. ¶ 158 ("But here the increases are extreme—jumping as much as [REDACTED] in some instances. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase."); PV EPP ¶ 204 ("But here the increases are extreme – jumping as much as 300-600% in one fell swoop. Such extreme pricing moves are not rational in the absence of advance knowledge that competitors will join the increase."); CB IRP Compl. ¶ 3 ("During the summer of 2014, prices of Clobetasol increased by an average of 1,144%, and in some instances by more than 1,700%."); DG IRP Compl. ¶ 65 (alleging that "[p]ricing for .125 mg and .250 mg tablets of Digoxin increased by roughly tenfold"); DV IRP Compl. ¶ 56 ("Mylan and Par's effective prices inexplicably increased sharply beginning in June 2013 . . . ."); DX IRP Compl. ¶ 77 ("Defendants' effective prices [for Doxy RR] inexplicably increased sharply beginning in November 2012 . . . ."); EC IRP Compl. ¶ 65 ("Defendants' effective prices inexplicably increased sharply beginning in July 2014."); PV IRP Compl. ¶ 8 ("Between mid-2013 and early 2014, the price per tablet [for pravastatin] rose by between 30 and 60 cents, depending on the dosage. These price increases were extreme and unprecedented, elevating prices sharply and without explanation until finally coming to rest at substantially the same elevated level, an increase of some 300% to 600%.").

[55] CB DPP Compl. ¶ 100; DG DPP Compl. ¶ 92; DV DPP Compl. ¶ 82; EC DPP Compl. ¶ 82; PV DPP Compl. ¶ 94; CB EPP Compl. ¶¶ 31, 117; DG EPP Compl. ¶ 25; DV EPP Compl. ¶¶ 93, 100; DX EPP Compl. ¶ 29; EC EPP Compl. ¶ 25; PV EPP Compl. ¶¶ 31, 133; CB IRP Compl. ¶ 123; DV IRP Compl. ¶ 73; DX IRP Compl. ¶ 112; *see also* DX DPP Compl. ¶ 115 ("It was the result of an agreement among Defendants to fix, maintain, and

them from parallel price increases" that might happen absent collusion.[56]  Prior to the alleged

price increases, the prices for each of these drugs had been stable over a period of time.[57]  Group

1 Plaintiffs allege that they "continue to pay[ ] supracompetitive prices for" the Group 1 drugs

today.[58]

Absent publicly available actual pricing information, Group 1 Plaintiffs' complaints rely

on two types of pricing data to support their claims.  First, the Group 1 complaints illustrate

increases in the effective prices of the relevant pharmaceuticals over time with detailed graphs

and tables.  For these graphs and tables, Group 1 Plaintiffs rely on data regarding "revenue, unit

sales and effective prices . . . obtained from QuintilesIMS Inc. ("IMS Health")."[59]  They allege

---

stabilize prices, rig bids, and allocate customers for the sale of Doxycycline in the United States."); DG IRP Compl. ¶¶ 90-96 (explaining that the expressed expectation of Lannett's CEO that Lannett would not have to engage in price competition in the generic drug market, including against Impax, Par and Mylan "suggests an agreement among them not to compete on price" and that "[t]heir subsequent conduct—raising prices, electing not to increase market share—further suggests the existence of such an agreement"); EC IRP Compl. ¶ 5 ("the significant increases in the prices of Econazole were the result of an illegal agreement among Defendants to fix prices"); PV IRP Compl. ¶ 10 ("the significant increases in the prices of Pravastatin were the result of an illegal agreement among Defendants").

[56] *See* CB DPP Compl. ¶ 207(9); DG DPP Compl. ¶ 218(8); DV DPP Compl. ¶ 174(8); DX DPP Compl. ¶ 232(7); EC DPP Compl. ¶ 172(8); PV DPP Compl. ¶ 195(9).

[57] *See* CB DPP Compl. ¶ 71 (alleging clobetasol prices were stable from December 2010 through May 2014); DG DPP Compl. ¶ 66 ("From May 2010 through September 2013. . . the standard deviation percentage of mean [digoxin] prices for Defendants Impax, Lannett and West Ward was no more than 7%."); DV DPP Compl. ¶ 65 ("Only Defendants Mylan and Par were selling any significant amounts of the relevant Divalproex ER products before the Class Period . . . .  From December 2010 through May 2013, . . . the standard deviation percentage of mean prices for Defendants Mylan and Par was no more than 12%."); DX DPP Compl. ¶ 76 ("From May 2010 through October 2012 . . . the prices for Doxycycline Regular Release were remarkably stable."); EC DPP Compl. ¶ 62 ("From December 2010 through June 2014 . . . [econazole] pricing was relatively stable."); PV DPP Compl. ¶ 65 (From January 2012 through April 2013, . . . Defendants' Pravastatin prices were remarkably stable."); *see also* CB EPP Compl. ¶ 92; DG EPP Compl. ¶ 77; DV EPP Compl. ¶¶ 77, 79; DX EPP Compl. ¶ 3; EC EPP Compl. ¶¶ 3, 75; PV EPP Compl. ¶¶ 91, 101; CB IRP Compl. ¶ 79; DG IRP Compl. ¶¶ 65-67; DV IRP Compl. ¶¶ 55-56; DX IRP Compl. ¶ 76-79 (alleging price stability for Doxy RR); EC IRP Compl. ¶ 65; PV IRP Compl. ¶ 87 ("Prices for Pravastatin were stable (and low) for many years—hovering at or below 10 cents per 10, 20, 40 mg tablet, and between 10 and 20 cents for 80 mg tablets, from 2010 to mid-2013.").

[58] *See* CB DPP Compl. ¶ 14; *see also* CB EPP Compl. ¶ 221 (alleging "defendants' unlawful conduct has inflicted continuing and accumulating harm"); CB IRP Compl. ¶ 212 (alleging "the Classes continue to pay supracompetitive prices . . . through the present").

[59] *See, e.g.,* CB DPP Compl. ¶ 66 n.24 (citing IMS Health data); DG DPP Compl. ¶ 61 n.26 (citing IMS Health data); DV DPP Compl. ¶ 60 n.26 (citing IMS Health data); DX DPP Compl. ¶ 71 n.29 (citing IMS Health

that "IMS Health is the largest vendor of physicians' prescribing data in the United States and is widely relied upon in the pharmaceutical industry and elsewhere."[60] Group 1 Plaintiffs also rely on data from the Centers for Medicare & Medicaid Services ("CMS") survey of National Average Drug Acquisition Cost ("NADAC"), which provides a "simple average of the drug acquisition costs submitted by retail pharmacies."[61]

Second, Group 1 Plaintiffs support their allegations that the relevant pharmaceuticals were subject to substantial price increases with detailed charts and, in some cases, graphs delineating their list or Wholesale Acquisition Cost ("WAC") prices over time. They allege that "[t]he WAC serves as a benchmark for prices throughout the distribution chain" because "[a] manufacturer first sells the drug to direct purchaser wholesalers based on the listed WAC, minus applicable discounts" and "[w]holesale[r]s then sell the drug to pharmacies."[62] WAC prices do not account for discounts or rebates.[63] Group 1 DPPs allege that, as part of the alleged conspiracies, Group 1 Defendants increased their WAC prices in lockstep or within weeks of each other, a pricing tactic that Group 1 DPPs contend "influences the actual prices paid" for the

_____

data); EC DPP Compl. ¶ 57 n.23 (citing IMS Health Data); PV DPP Compl. ¶ 60 n.23 (citing IMS Health Data).

[60] *Id.*

[61] CB EPP Compl. ¶ 75 (internal quotation marks and citation omitted). *See, e.g.*, CB EPP Compl. ¶ 93 (citing NADAC data); DG EPP Compl. ¶¶ 79-80 (citing NADAC data); CB IRP Compl. ¶ 79 (citing NADAC data); DG IRP Compl. ¶ 66 (citing NADAC data); DV IRP Compl. ¶ 67 (citing NADAC data); PV IRP Compl. ¶ 90 (citing NADAC data*); see also* DX DPP Compl. ¶¶ 81-92 (citing IMS and NADAC data); EC DPP Compl. ¶¶ 75-88 (citing IMS and NADAC data); PV EPP Compl. ¶¶ 95-120 (citing IMS and NADAC data).

[62] CB IRP Compl. ¶ 83; *see also* CB DPP ¶ 59; DG DPP Compl. ¶ 54; DV DPP Compl. ¶ 53; DX DPP Compl. ¶ 60; EC DPP Compl. ¶ 50; PV DPP Compl. ¶ 53.

[63] *See, e.g.,* CB EPP Compl. ¶ 76 ("WAC prices do not take into account discounts that may be provided, e.g., for volume sales."); *see also* CB DPP Compl. ¶ 59 ("The WAC typically functions as the manufacturer's list or benchmark price in sales to wholesalers or other direct purchasers and typically does not include discounts that may be provided, *e.g.*, for volume sales."); CB IRP Compl. ¶ 82, n.40 ("As list prices, [WAC prices] do not reflect discounts or rebates.").

relevant pharmaceuticals.[64]  Likewise, Group 1 EPPs allege that Group 1 Defendants "raised

their WAC prices to essentially the same level at nearly the same time."[65]  Group 1 IRPs allege

that Group 1 Defendants' WAC prices increased and were accompanied by corresponding

increases of their effective prices.[66]

EPPs and IRPs allege they were injured by defendants' allegedly unlawful pricing

practices even though they are indirect purchasers of the Group 1 drugs, explaining that

> General economic principles recognize that any overcharge at a higher level of
> distribution generally results in higher prices at every level below.  Moreover, the
> institutional structure of pricing and regulation in the pharmaceutical drug
> industry assures that overcharges at the higher level of distribution are passed on
> to Plaintiffs.  Wholesalers and retailers passed on the inflated prices to Plaintiffs
> and members of the Class.  The impairment of generic competition at the direct
> purchaser level similarly injured Plaintiffs who were equally denied the

[64] See CB DPP Compl. ¶ 95 (lockstep); DG DPP Compl. ¶ 82 (lockstep); DV DPP Compl. ¶ 78 (lockstep); DX DPP Compl. ¶ 91 (alleging WAC prices for Doxy RR only increased within weeks of each other); EC DPP Compl. ¶ 77 (lockstep); PV DPP Compl. ¶ 88 (lockstep).

[65] CB EPP Compl. ¶ 95; see also DG EPP Compl. ¶ 82 ("WAC for Defendants' various dosages of Digoxin are highly coordinated."); DV EPP Compl. ¶ 90 ("Defendants coordinated not only their effective sales prices to customers, but also their benchmark prices such as WAC."); DX EPP Compl. ¶ 94 (citing WAC prices for Doxy RR manufacturers and explaining that "Price hikes are also demonstrated by changes in WAC for Doxycycline. Even though their WAC price changes represented about a twenty fold increase from previous WACs, Actavis, West-Ward, and Sun all raised the WACs on the 50 mg. capsules to identical benchmark prices over a two-week period."); EC EPP Compl. ¶ 90 ("Defendants raised their WACs for generic Econazole products to identical prices even though it meant increasing them by as much as 890%."); PV EPP Compl. ¶ 121 ("Defendants Zydus, Lupin, and Teva, who dominated the Pravastatin market in 2013, reported identical WACs for all four dosages—even though it meant roughly doubling or tripling their previous benchmarks"), ¶ 122 ("Likewise, Apotex, who with Defendants Zydus, Lupin, and Teva, collectively represented approximately 75% of the market in 2013, approximately doubled its WACs at the start of the Class Period").

[66] See CB IRP Compl. ¶ 84; see also DG IRP Compl. ¶ 81 ("In October 2013, Lannett and Impax reported identical WACs—even though that meant a several fold increase from their previous benchmarks. Instead of competing on price, Par, West-Ward, and Mylan, reported the same WAC benchmarks as Lannett and Impax, as they entered the market."); DV IRP Compl. ¶ 68 ("Mylan and Par set identical WACs within a couple weeks of each other at the start of the Class Period; and Dr. Reddy's and Zydus matched those WACs in August, around the time they each entered the market:"); DX IRP Compl. ¶ 92 (citing substantial WAC price increases by Actavis, Sun, Par and West-Ward for two strengths of Doxycycline RR capsules and tablets over a two-week period); EC IRP Compl. ¶ 78 (citing substantial percentage increases in WAC prices for econazole); PV IRP Compl. ¶ 122 ("Corresponding increases in Pravastatin's transactional prices demonstrate that increased WAC prices translate to increases in the prices paid by Plaintiffs.").  The Court notes that the pravastatin IRPs do not cite specific WAC data in their complaint.  Instead, they explain that their complaint explains relies on the IMS Health NSP data "which 'captures 100% of the total U.S. pharmaceutical market, measuring sales at actual transaction prices rather than using an average wholesale price' and includes sales by manufacturers into various outlets."  PV IRP Compl. ¶ 64 (citation omitted).

opportunity to purchase less expensive generic versions of [the Group 1 drugs].[67]

## F. GOVERNMENT INVESTIGATIONS

Group 1 Class Plaintiffs allege that price increases for the Group 1 drugs prompted government scrutiny of pricing practices in the generic pharmaceutical industry. In support of their claims, they cite a federal Department of Justice ("DOJ") criminal investigation and grand jury proceeding focusing on possible collusion in the industry, an investigation by 45 state attorneys' general led by the State of Connecticut, and congressional inquiries into generic drug pricing practices.[68] They contend Group 1 Defendants have been implicated in these investigations to varying degrees.

Group 1 Plaintiffs' complaints each cite an ongoing DOJ criminal investigation regarding certain drug manufacturers' conduct with respect to generic drugs. They allege that as a result of this investigation, Defendant Heritage's former CEO, Jeffrey Glazer, pled guilty on January 29, 2017 to felony charges that he conspired with others "engaged in the production and sale of generic pharmaceutical products including Doxycycline Hyclate, the primary purpose of which was to allocate customers, rig bids and fix and maintain prices of Doxycycline Hyclate sold in

---

[67] CB IRP Compl. ¶ 219. *Accord* CB EPP Compl. ¶ 228. Explaining their conception of the multi-layered supply chain for generic pharmaceuticals, EPPs and IRPs allege that:

> [m]anufacturers sell drugs to wholesalers. Wholesalers sell drugs to pharmacies. Pharmacies dispense the drugs to consumers, who pay the full retail price if they are uninsured, or a portion of the retail price (*e.g.*, a co-pay or co-insurance) if they are insured. The insured consumers' health plans then pay the pharmacies additional amounts that are specified in agreements between them and the pharmacies. These agreements are sometimes arranged by middlemen known as Pharmacy Benefits Managers ("PBMs").

CB EPP Compl. ¶ 74; CB IRP Compl. ¶ 66.

[68] *See, e.g.*, CB DPP Compl. ¶ 8 ("Defendants' and other generic pharmaceutical manufacturers' conduct has resulted in extensive scrutiny by federal and state regulators, including by the Antitrust Division of the United States Department of Justice . . . , the United States Senate, the United States House of Representatives, and at least 45 attorneys general from 44 states and the District of Columbia . . . ."); CB EPP Compl. ¶ 9 ("Extreme and unprecedented price increases in the generic drug industry . . . have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants."); CB IRP Compl. ¶ 9 (same as EPP).

the United States in furtherance of the conspiracy."[69] Group 1 Plaintiffs also allege that Jason Malek, another former Heritage executive, "admitted substantially the same facts" in pleading guilty to felony charges on the same day.[70] They allege that Glazer and Malek "are cooperating with DOJ's continuing investigation . . . ."[71] In addition, Group 1 EPPs and IRPs contend that "[i]t is understood that Heritage is cooperating with prosecutors in exchange for amnesty from criminal prosecution under DOJ's leniency program[.]"[72]

All Group 1 Plaintiffs include allegations regarding the Glazer and Malek guilty pleas in their complaints,[73] asserting that the pleas are broadly relevant to their claims even though Defendant Heritage is alleged to have manufactured only one of the Group 1 drugs (doxycycline)[74] and even though the guilty pleas do not explicitly concern all of the drugs implicated in the complaints addressed in this Opinion. Group 1 DPPs contend the ongoing criminal investigation is relevant to *all* of their claims, noting DOJ's intervention in this MDL and its motion for a stay of discovery stating that "[e]vidence uncovered during the criminal investigation implicates other companies and individuals (including a significant number of the

---

[69] *See, e.g.*, DX DPP Compl. ¶ 13; *see also* CB DPP Compl. ¶ 197; CB EPP Compl. ¶¶ 15-16; CB IRP Compl. ¶¶ 15-16.

[70] *See, e.g.*, DX DPP Compl. ¶ 14; *see also* CB DPP Compl. ¶ 197; CB EPP Compl. ¶¶ 15-16; CB IRP Compl. ¶¶ 15-16.

[71] *See, e.g.*, CB EPP Compl. ¶ 16; CB IRP Compl. ¶ 16; *see also* CB DPP Compl. ¶ 10.

[72] CB EPP Compl ¶ 22 (citation and internal quotation omitted, alteration in original); CB IRP Compl. ¶ 22 (citation and internal quotation omitted, alteration in original). Group 1 IRPs allege that in order to participate in the leniency program, applicants must "admit . . . participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers or sales or production volumes . . . ." *See* CB IRP Compl. ¶ 22; DG IRP Compl. ¶ 19; DV IRP Compl. ¶ 154; DX IRP Compl. ¶ 202; EC IRP Compl. ¶ 20; PV IRP Compl. ¶ 25; *see also* CB EPP Compl. ¶ 22 (alleging that an applicant for leniency "must also establish that the confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials") (alteration and internal quotation omitted).

[73] *See, e.g.*, DX DPP Compl. ¶¶ 13-14; CB IRP Compl. ¶¶ 15-16; DV EPP Compl. ¶¶ 15-16.

[74] More specifically, Heritage is alleged to have sold only Doxy DR. *See* DX DPP Compl. ¶¶ 8, 106; DX EPP Compl. ¶ 119; DX IRP Compl. ¶¶ 7, 100.

Defendants here) in collusion with respect to doxycycline hyclate, glyburide, and other drugs (including a significant number of the drugs at issue here)."[75]  Group 1 EPPs and IRPs also suggest the relevance of the DOJ investigation goes beyond the doxycycline claims, alleging that it is "growing" and that "DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on [as many as 16 or 17] generic drug manufacturers as part of the growing investigation, including" these Defendants relevant to the Group 1 cases:  Actavis; Dr. Reddy's; Heritage; Impax; Lannett; Mayne; Mylan; Par; Perrigo; Sandoz; Sun; Taro; Teva; and Zydus.[76]

In addition, Group 1 Plaintiffs allege that an ongoing separate investigation by 45 states with the Attorney General for the State of Connecticut as its leader also has "uncovered a wide-ranging series of conspiracies implicating numerous different generic pharmaceuticals and competitors."[77]  Group 1 DPPs contend that the state "investigation is broad in scope and goes beyond doxycycline hyclate DR and glyburide," citing filings by the State AGs with the JPML in this litigation.[78]

---

[75] *See* CB DPP Compl. ¶ 198; DG DPP Compl. ¶ 209; DV DPP Compl. ¶ 165; DX DPP Compl. ¶ 223; EC DPP Compl. ¶ 164; PV DPP Compl. ¶ 186.

[76] CB IRP Compl. ¶ 19 ("at least sixteen generic drug manufacturers"); DG IRP Compl. ¶ 16 (16); EC IRP Compl. ¶ 17 (16); PV IRP Compl. ¶ 22 (16); CB EPP Compl. ¶ 19 ("DOJ and a federal grand jury empaneled in the Eastern District of Pennsylvania have focused on at least seventeen generic drug manufacturers as part of the growing investigation"); DG EPP Compl. ¶ 19 (17); DV EPP Compl. ¶ 19 (17); DX EPP Compl. ¶ 23 (17);  EC EPP Compl. ¶ 19 (17); PV EPP Compl. ¶ 24 (17); *see also* DV IRP Compl. ¶¶ 145-50 ("Each of the Defendants here has been ensnared in the DOJ's ongoing probe," alleging Dr. Reddy's, Mylan and Par have received DOJ subpoenas and that "recent press reports have stated the Zydus is also a target of the DOJ's sweeping investigation"); DX IRP Compl. ¶ 9 ("The DOJ empaneled a federal grand jury in this District, which has issued subpoenas relating to price-fixing and other anticompetitive conduct in the generic pharmaceutical industry, including to at least Defendants Actavis, Mayne, Mylan, and Sun.").
Group 1 Plaintiffs' complaints do not specifically identify Akorn or the Hi-Tech Defendants, Apotex, Glenmark, Lupin, Teligent, West-Ward or the Wockhardt Defendants as being a part of the DOJ investigation.

[77] CB DPP Compl. ¶ 200; DG DPP Compl. ¶ 211; DV DPP Compl. ¶ 167; DX DPP Compl. ¶ 225; EC DPP Compl. ¶ 166; PV DPP Compl. ¶ 188; CB EPP Compl. ¶ 23; DG EPP Compl. ¶ 23; DV EPP Compl. ¶ 23; DX EPP Compl. ¶ 27; EC EPP Compl. ¶ 23; PV EPP Compl. ¶ 28.

[78] CB DPP Compl. ¶ 202; DG DPP Compl. ¶ 213; DV DPP Compl. ¶ 169; DX DPP Compl. ¶ 227; PV DPP

The reach of the DOJ and State AG investigations is illustrated by allegations in Group 1 Plaintiffs' complaints that many of the Group 1 Defendants (or their parent entities) have received subpoenas related to the DOJ or State investigations into generic drug prices or have otherwise been made targets of the investigations as follows:

- The clobetasol complaints include allegations that subpoenas have been served on Actavis's former parent Allergan, Sandoz, and Taro and that search warrants were executed at Perrigo's corporate offices.[79]

- The digoxin complaints include allegations that subpoenas have been served on Impax, Lannett, Mylan, and Par.[80]

- The divalproex ER complaints include allegations that subpoenas have been served on Dr. Reddy's, Mylan, and Par.[81] There is no allegation in the divalproex ER complaints that Zydus has received a subpoena, but it is alleged that there have been "press reports" stating that Zydus is a target of the DOJ investigation.[82]

- The doxycycline complaints include allegations that subpoenas have been served on Actavis's parent Allergan, Mayne, Mylan, Par, and Sun.[83]

- The econazole complaints include allegations that subpoenas have been served on Sun and on officers of Taro and that search warrants were executed at Perrigo's corporate

---

Compl. ¶ 190; *see also* EC DPP Compl. ¶ 166 (citing a media report that the State AG action was growing beyond the companies involved in the manufacture of doxycycline hyclate and glyburide).

[79] *See* CB DPP Comp. ¶¶ 187-90; *see also* CB EPP Comp. ¶¶ 26-29; CB IRP Compl. ¶ 26.

[80] *See* DG DPP Compl. ¶¶ 197-200, 202.

[81] *See* DV DPP Compl. ¶¶ 154-55, 157.

[82] *See* DV DPP Comp;. ¶ 158.

[83] *See* DX DPP Compl. ¶¶ 212-14, 216-17; DX EPP Compl. ¶ 13.

offices.[84]

- The pravastatin complaints include allegations that Sandoz and Teva have received subpoenas and, as above, that Zydus has been reported as a target of the investigations in the press.[85]

Group 1 Plaintiffs' subpoena allegations are based on defendants' public disclosures, including various corporate filings with the Securities and Exchange Commission, corporate press releases and corporate annual reports.[86] The allegations tie all of the subpoenas to the subject Defendants' generic drug pricing practices, although not all of the alleged subpoenas include specific inquiries into pricing for the particular drugs at issue in the Group 1 complaints.

However, not all of the Group 1 Defendants are alleged to have received subpoenas. There are no allegations in the clobetasol complaints that the Hi-Tech Defendants or the Wockhardt Defendants received subpoenas. There are no allegations in the digoxin or doxycycline complaints that West-Ward received subpoenas. There are no allegations in the econazole complaints that Teligent received subpoenas. Finally, there are no allegations in the pravastatin complaints that Apotex, Glenmark, or Lupin received subpoenas.

Group 1 Plaintiffs also support their claims by pointing to allegations that generic drug prices have received Congressional attention. For instance, the divalproex ER and doxycycline IRPs allege that

> [o]n October 2, 2014, Senator Bernie Sanders (I-VT), Chair of the Subcommittee on Primary Health and Aging, Senate Committee on Health, Education, Labor and Pensions, and Representative Elijah E. Cummings (D-MD), the Ranking Member of the House Committee on Oversight and Government Reform, sent letters to 14 drug manufacturers requesting information about the escalating prices of generic

---

[84] *See* EC DPP Compl., ¶ 157; EC EPP Compl. ¶¶ 175(k) and 175(o).

[85] *See* PV DPP Compl. ¶¶ 177-78; PV EPP Compl. ¶ 224(q).

[86] *See, e.g.*, CB DPP Compl. ¶¶ 187-92.

drugs used to treat everything from common medical conditions to life-threatening illnesses.[87]

Similarly, pravastatin IRPs allege that "[i]n the fall of 2014, Senator Sanders and Representative Cummings requested information from manufacturers of 10 drugs that had experienced extraordinary price increases. Six of those drugs are now the subject of complaints in this MDL."[88] They also allege that "Senator Sanders and Representative Cummings followed up with a request to the Office of the Inspector General of the Department of Health & Human Services ("OIG"), asking it to investigate the effect that price increases of generic drugs have had on the Medicare and Medicaid programs."[89] Group 1 DPPs allege that in response to the request by Sanders and Cummings, the OIG advised that it would examine prices for the top 200 generic drugs to "determine the extent to which the quarterly [Average Manufacturer Pricing] exceeded the specified inflation factor."[90] The OIG then issued a report in December 2015 "confirming that price increases for numerous generic drugs far outpaced inflation."[91]

In addition, Group 1 EPPs allege that the U.S. Government Accountability Office ("GAO") issued a separate report addressing generic drug pricing in August 2016 in response to a request from Senators Susan Collins, Claire McCaskill, Bill Nelson, and Mark Warner.[92] The

---

[87] *See, e.g.*, DV IRP Compl. ¶ 136; DX IRP Compl. ¶ 185; *cf.* CB IRP Compl. ¶ 9 (alleging that "[e]xtreme and unprecedented price increases in the generic drug industry—like those imposed by manufacturers of Clobetasol—have prompted close scrutiny of the industry by the U.S. Congress, federal and state enforcement agencies, and private litigants" but including no further details regarding congressional scrutiny); DG IRP Compl. ¶ 6 (same); EC IRP Compl. ¶ 7 (same).

[88] PV IRP Compl. ¶ 69.

[89] *Id.* ¶ 70.

[90] CB DPP Compl. ¶ 182; DG DPP Compl. ¶ 193; DV DPP Compl. ¶ 149; DX DPP Compl. ¶ 208; EC DPP Compl. ¶ 150; PV DPP Compl. ¶ 172 (alteration in originals).

[91] PV IRP Compl. ¶ 70.

[92] CB EPP Compl. ¶ 85; DG EPP Compl. ¶ 71; DV EPP Compl. ¶ 69; DX EPP Compl. ¶ 111; EC EPP Compl. ¶ 66; PV EPP Compl. ¶ 74. Pravastatin IRPs' complaint also cites the GAO report issued in response to the request for information from Senators Collins, McCaskill, Nelson and Warner. PV IRP Compl. ¶ 71.

title of the August 2016 report was "Generic Drugs Under Medicare: Part D Generic Drug Prices Declined Overall, but Some Had Extraordinary Price Increases."[93]  The report identified relevant formulations of clobetasol, digoxin, divalproex ER, econazole, and pravastatin as having experienced "extraordinary" price increases even though other generic drug prices had declined or remained stable in the absence of shortages or other market disruptions.[94]

## G.  OPPORTUNITIES TO CONSPIRE

Group 1 Plaintiffs assert that Defendants had opportunities to conspire through: (1) representation on trade association boards of directors; (2) trade association membership; (3) attendance at trade association meetings and events; and (4) other industry gatherings.  They allege these contacts facilitated "secret, conspiratorial meetings, discussions, and communications [that] helped to ensure that all Defendants agreed to participate in, implement, and maintain an unlawful bid-rigging, price-fixing, and market and customer allocation scheme."[95]

The following Group 1 Defendants are alleged to have had some level of representation on the board of directors of the Generic Pharmaceutical Association ("GPhA") (now called the Association for Accessible Medicines) before or during the putative class period:  for

---

[93] *Id.*

[94] *Id.*; *see also* CB DPP Compl. ¶ 183; DG DPP Compl. ¶ 194; DV DPP Compl. ¶ 150; DX DPP Compl. ¶ 209; EC DPP Compl. ¶ 151; PV DPP Compl. ¶ 173.

[95] CB DPP Compl. ¶ 103; *see also* CB DPP Compl. ¶ 101 (alleging that during their interactions with each other, Defendants engaged in anticompetitive activities including "[a]greeing . . . to engage in market and customer allocation or bid rigging" and "agreeing . . . not to compete against each other for certain customers . . ."); CB EPP Compl. ¶ 153 (alleging Defendants' employees used conferences and trade shows as "opportunities to discuss and share upcoming bids, specific generic drug markets, pricing strategies and pricing terms in their contracts with customers"); CB IRP Compl. ¶ 123 (alleging Defendants' agreement to increase the price of and restrain competition for the sale of Clobetasol "was furthered through Defendants' participation in trade association meetings and events, including GPhA's June 2014 CMC Workshop . . .").

clobetasol—Actavis, Perrigo, the Sandoz Defendants, and Taro[96]; for digoxin—Impax, the Mylan Defendants, and Par[97]; for divalproex ER—Dr. Reddy's, the Mylan Defendants, Par, and Zydus[98]; for doxycycline—Actavis, Heritage, the Mylan Defendants, Par, and Sun[99]; for econazole—Perrigo and Taro[100]; and for pravastatin—Apotex, Lupin, the Sandoz Defendants, Teva, and Zydus.[101]

Each Group 1 complaint also notes that Glazer represented Heritage on the board of the GPhA[102] before pleading guilty to federal criminal charges and admitting to attending "meetings with the co-conspirators involved in the production and sale of Doxycycline Hyclate" where "agreements were reached to allocate customers, rig bids and fix and maintain the prices of Doxycycline Hyclate sold in the United States."[103] Glazer is alleged to have been on the board of the GPhA from 2012-2016 and his term overlapped with executives from other Defendants, including some who manufactured Group 1 drugs other than doxycycline: Actavis (clobetasol and Doxy RR), Apotex (pravastatin), Impax (digoxin), Lupin (pravastatin), Mylan (digoxin and divalproex ER in addition to doxycycline), Par (also digoxin and divalproex ER in addition to Doxy RR), Perrigo (clobetasol and econazole), Sandoz (clobetasol and pravastatin), Teva

---

[96] *See* CB EPP Compl. ¶125; CB IRP Compl. ¶ 131 (a representative of Taro's parent, Sun, joined the board in 2016).

[97] *See* DG DPP Compl. ¶ 101.

[98] *See* DV DPP Compl. ¶ 91.

[99] *See* DX DPP Compl. ¶¶ 124-28.

[100] *See* EC DPP Compl. ¶ 91.

[101] *See* PV DPP Compl. ¶ 103.

[102] *See, e.g.*, DX DPP Compl. ¶¶ 124-27.

[103] *Id.* ¶ 67.

(pravastatin), and Zydus (divalproex ER and pravastatin).[104] Certain Group 1 Defendants are not alleged to have had any GPhA board representatives at any time: the Hi-Tech Defendants and the Wockhardt Defendants (clobetasol); Lannett and West-Ward (digoxin and Doxy RR), Mayne (Doxy DR), Teligent (econazole), and Glenmark (pravastatin).[105] However, at least one manufacturer of each Group 1 drug had a representative on the GPhA board of directors at some point in time during the putative class period.

Group 1 Plaintiffs also allege that Defendants had opportunities to conspire because they had contact with each other as regular members of certain trade associations as follows:

- Of the clobetasol Defendants, at least Actavis, Perrigo, the Sandoz Defendants and the Wockhardt Defendants are alleged to have been "regular members of the GPhA during the Class Period."[106] In addition, Actavis, the Sandoz Defendants, and Wockhardt were members of the Healthcare Distribution Management Association ("HDMA") (now called the Healthcare Distribution Alliance),[107] while the Hi-Tech Defendants, Perrigo, the Sandoz Defendants, Taro, and Wockhardt were members of the National Association of Chain Drug Stores ("NACDS").[108]

- All of the digoxin Defendants are alleged to have been HDMA members.[109] Digoxin Defendants alleged to have been regular members of the GPhA include Impax, Mylan,

---

[104] CB DPP Compl. ¶¶ 109-10; DG DPP Compl. ¶ 101; DV DPP Compl. ¶ 91; DX DPP Compl. ¶¶ 124-28; EC DPP Compl. ¶¶ 90-91; PV DPP Compl. ¶ 103.

[105] Taro is alleged to have had GPhA board representation when the IRP complaint was filed but not before. EC IRP Compl. ¶ 100.

[106] CB DPP Compl. ¶ 108; CB EPP Compl. ¶ 124; *see also* CB IRP Compl. ¶ 130 ("Defendants are current or recent regular members of the GPhA.").

[107] *See* CB EPP Compl. ¶ 128.

[108] *See* CB IRP Compl. ¶ 133.

[109] *See* DG DPP Compl. ¶ 104.

Par and West-Ward."[110]

- All of the divalproex ER Defendants are alleged to have been members of both the GPhA and the HDMA.[111]

- All of the doxycycline Defendants with the exception of Mayne are alleged to have been GPhA members.[112]

- Of the econazole Defendants, Perrigo and Taro are alleged to have been NACDS members,[113] and Perrigo is alleged to have been a GPhA member during the class period.[114] Only Teligent is not alleged to have been a regular member of any trade association.

- The pravastatin Defendants are all alleged to have been regular members of the GPhA,[115] and all but Glenmark are alleged to have been HDMA members.[116]

Group 1 DPPs allege that during "meetings, conversations, and communications," Defendants agreed "to engage in customer and market allocation or bid rigging" and also agreed "not to compete against each other for certain customers."[117] More specifically, they allege that Defendants' high-level representatives, including employees with price-setting authority,[118]

---

[110] *See* DG DPP Compl. ¶ 100; DG EPP Compl. ¶ 105; DG IRP Compl. ¶ 101.

[111] *See* DV DPP Compl. ¶¶ 90, 94.

[112] *See* DX DPP Compl. ¶ 129.

[113] *See* EC IRP Compl. ¶ 103.

[114] EC DPP Compl. ¶ 90.

[115] PV DPP Compl. ¶ 102.

[116] PV DPP Compl. ¶ 106.

[117] CB DPP Compl. ¶¶ 101(c)-(d); DG DPP Compl. ¶¶ 93(c)-(d); DV DPP Compl. ¶ 83(c)-(d); DX DPP Compl. ¶ 116(c)-(d); EC DPP Compl. ¶ 83(c)-(d); PV DPP Compl. ¶ 95(c)-(d).

[118] *See* CB DPP Compl. ¶ 118; DG DPP Compl. ¶ 110; DV DPP Compl. ¶ 98; DX DPP Compl. ¶ 137; EC DPP Compl. ¶ 96; PV DPP Compl. ¶ 113*; see also* DG EPP Compl. ¶ 113.

attended meetings and industry events hosted by the GPhA, the HDMA, the Minnesota

Multistate Contracting Alliance for Pharmacy ("MMCAP"), the NACDS, Efficient Collaborative

Retail Marketing ("ECRM"), and/or the National Pharmacy Forum ("NPF").[119]  Group 1

Plaintiffs contend that Defendants shared information at these events about their current and

future business plans and thus had an "opportunity to communicate about bids and pricing

strategy, and share information regarding the terms of their contracts with customers, including

various terms relating to pricing, price protection, and rebates."[120]  Although the specific

allegations of attendance at industry events vary from complaint to complaint, Group 1

Plaintiffs' complaints each include allegations regarding Defendants' attendance at trade

association meetings taking place over a number of years, identifying meeting dates and names

and job titles of employees who attended on Defendants' behalf.[121]

 While there are fewer allegations regarding meeting attendance for some Defendants than

for others, all Group 1 Defendants are alleged to have attended at least one trade association

gathering as follows:

- Representatives from each of the clobetasol Defendants are specifically alleged to have

  attended GPhA, NACDS, and other meetings, while representatives of all but Perrigo are

---

[119] See CB DPP Compl. ¶ 100; DG DPP Compl. ¶ 92; DV DPP Compl. ¶ 82; DX DPP Compl. ¶ 115; EC DPP Compl. ¶ 82; PV DPP Compl. ¶ 94.

[120] See, e.g., CB IRP Compl. ¶ 147; see also DG EPP Compl. ¶ 6 ("Defendants' attendance at trade association meetings, conferences, and workshops provided ample opportunities to agree on Digoxin prices and allocate markets and customers for Digoxin.").

[121] See, e.g., CB DPP Compl. ¶¶ 119, 121, 123-25, 127, 129, 131-32, 135; DG DPP Compl. ¶¶ 113-15, 117, 120-21, 124-25, 127, 132-34; DV DPP Compl. ¶¶ 99, 101-03, 105, 108-10, 112; DX DPP Compl. ¶¶ 139-42; 144, 147-48, 150-51, 153; EC DPP Compl. ¶¶ 99-100, 102, 105-06, 108, 111-12, 114; PV DPP Compl. ¶¶ 114, 116-19, 121-26, 128-29, 131-32, 134; see also CB EPP Compl. ¶¶ 135, 137, 139-41, 143, 145, 147-49, 151; CB IRP Compl. ¶¶ 135, 138, 139.

alleged to have attended HDMA meetings.[122]

- Representatives from all of the digoxin Defendants are alleged to have attended GPhA, HDMA and NACDS meetings.[123]  Lannett and the Mylan Defendants are alleged to have been represented at MMCAP meetings.[124]  Lannett, Par, and West-Ward are alleged to have been represented at certain meetings.[125]  Representatives of the Mylan Defendants and West-Ward are alleged to have attended an NPF meeting.[126]

- All of the divalproex ER Defendants are alleged to have representatives in attendance at meetings of the GPhA, HDMA, NACDS, and others.[127]

- With the exception of Mayne, the doxycycline Defendants were represented at meetings of the GPhA, HDMA, MMCAP, and NACDS.[128]  Mayne is only alleged to have been represented at the 2014 NACDS Total Store Expo.[129]  Actavis, Heritage, Par, Sun, and West-Ward are also alleged to have had representatives at another organization's meetings.[130]

- Representatives from each of the econazole Defendants are alleged to have attended meetings of the GPhA and another organization.[131]  This includes Teligent,[132] who is not

---

[122] *See* CB DPP ¶¶ 119-36.

[123] *See, e.g.*, DG DPP Compl. ¶¶ 110, 115, 117, 128.

[124] *See id.* at ¶ 124.

[125] *See id.* at ¶¶ 109, 113.

[126] *See id.* at ¶ 132.

[127] *See* DV DPP Compl. ¶¶ 97-100, 102-07, 109-10, 113.

[128] *See* DX DPP Compl. ¶¶ 138-39, 141-46, 148-54.

[129] *See id.* at ¶ 153.

[130] *See id.* at ¶¶ 136, 140, 147.

[131] *See* EC DPP Compl. ¶¶ 98 ("On February 20-22, 2013, GPhA held its 2013 Annual Meeting in Orlando,

alleged to have been a member of any trade association. It is specifically alleged that representatives of Perrigo and Taro attended NACDS meetings.[133]

- All of the pravastatin Defendants are alleged to have been represented at GPhA, HDMA, and NACDS meetings.[134] It is also specifically alleged that representatives of Apotex and Teva "regularly attended" MMCAP meetings[135] and that Apotex, Lupin, Sandoz, and Zydus attended other meetings.[136]

Group 1 Plaintiffs also allege that Defendants' anticompetitive scheme involved "private meetings, dinners, and outings among smaller groups of employees of various generic drug manufacturers, and . . . individual private communications between and among Defendants' employees through use of the phone, electronic messaging and similar means."[137] For example, Defendants' employees allegedly "discuss[ed] competitively sensitive information" at "Girls' Night Out" or "Women in the Industry" gatherings, including, in 2015, "(1) in Baltimore,

---

Florida that was attended by representatives of at least Defendants Perrigo, Teligent, and Taro."); *see also id.* at ¶ 99 (alleging executives from Perrigo, Taro, and Teligent attended an organization's meeting).

[132] Representatives from Teligent are alleged to have attended a total of four trade association meetings, and two Teligent executives are specifically named as having attended three of those four meetings. *See id.* at ¶¶ 98, 99, 105, 111.

[133] *See id.* at ¶ 100.

[134] *See* PV DPP Compl. ¶¶ 115, 117, 118. Although Glenmark argues pravastatin Plaintiffs' claims against it should be dismissed because it "is not alleged to have attended many of the trade association meetings identified in the Complaints," PV Glenmark Mem. in Support of Mot. to Dismiss at 8, pravastatin Plaintiffs identify specific Glenmark executives as having attended various trade association meetings. *See, e.g.* PV DPP Compl. at ¶ 117(b) (NACDS); *id.* at ¶ 118(b) (HDMA); *id.* at 119(b) (NACDS); *id.* at ¶ 126(b) (NACDS); *id.* at ¶ 129(b) (HDMA); *id.* at ¶ 131(b) (NACDS). This is enough to permit the claims against Glenmark to survive dismissal.

[135] *See id.* at ¶ 109.

[136] *See id.* at ¶ 116.

[137] CB DPP Compl. ¶ 102; *see, e.g.* PV DPP Compl. ¶ 138 ("[I]n January 2014, at a time when the prices of a number of generic drugs were reportedly soaring, at least thirteen high-ranking male executives, including CEOs, Presidents, and Senior Vice Presidents of various generic drug manufacturers, met at a steakhouse in Bridgewater, New Jersey.").

Maryland in May and (2) at the NACDS conference in August . . . ."[138]

Doxycycline DPPs also include further specific allegations of communications between certain of the doxycycline Defendants in their complaint. They allege that

> [i]n May 2013, as Heritage was gearing up to launch Doxycycline DR, Heritage executives engaged in communications with various executives at Mylan. . . . For example, Malek asked another executive at Heritage to set up a call between Malek and the Vice President of Sales at Mylan, Bob Potter ("Potter"). Malek and Potter frequently attended the same industry events. For example, both attended the NACDS Store Expo held every August throughout the Class Period. The other Heritage executive recommended that Malek contact Jan Bell ("Bell") Director, National Accounts at Mylan. Malek promptly connected with Bell through the website LinkedIn. Malek and Bell communicated by phone on multiple occasions and continued to communicate about various drugs including Doxycycline DR. Also in May 2013, Glazer emailed another executive at Mylan. That Mylan executive responded with a phone number where he could be reached in England, and the two spoke the next day. . . . During the course of these and other communications, Heritage and Mylan executives agreed to allocate market and customers, coordinate on bidding for customers, and otherwise refrain from competing with one another concerning Doxycycline DR. The objective was to avoid competition on pricing that would reduce profitability for both companies. Heritage executives made clear that the purpose of the agreement was to maintain prices.[139]

Doxycycline DPPs also allege that before Mayne entered the Doxy DR market in February 2014, "Mayne approached Heritage . . . about obtaining market share and refraining from competition. For example, in January 2014, the month before Mayne entered, a Mayne employee and a Heritage employee spoke by phone."[140]

## H. PUBLIC STATEMENTS

Group 1 Plaintiffs also seek to bolster their claims with numerous allegations regarding

---

[138] CB DPP Compl. at ¶ 140; *see also* CB EPP Compl. ¶ 156, CB IRP Compl. ¶ 146. Although the Group 1 complaints note that certain alleged gatherings between Defendants' employees were specific to a particular gender, Group 1 Plaintiffs do not assign particular significance to these details. Neither does the Court. What matters is that Group 1 Plaintiffs have alleged that certain of Defendants' employees—regardless of their gender—had opportunities to gather together.

[139] DX DPP Compl. at ¶¶ 108-09.

[140] *Id.* at ¶ 110.

investor communications (including comments made by certain Defendants' executives) along with other industry commentary.[141]  The alleged investor communications include statements regarding drug prices and financial results.  For example, Digoxin DPPs allege that in a November 2014 quarterly earnings call, Lannett's CEO predicted that "price increases would continue" and "expressed confidence that Lannett would not have to engage in price competition generally for it[s] generics."[142]  Specifically, they allege he said that "Lannett and its competitors were 'less concerned about grabbing market share.  We're all interested in making a profit, not how many units we sell.'"[143]  Industry commentary allegations include a statement from "Richard Evans at Sector & Sovereign Research" who wrote that "[a] plausible explanation [for price increases] is that generic manufacturers, having fallen to near historic low levels of financial performance are cooperating to raise the prices of products whose characteristics – low sales due to either very low prices or very low volumes – accommodate price inflation."[144]  Another example of industry commentary allegations:  Econazole DPPs cite a comment during an earnings call from "industry analyst Gregg Gilbert from Deutsche Bank" that "[o]bviously, the generic side of your business and many other companies has benefited from an enhanced pricing environment, if we could call it that, in the last several years."[145]

Group 1 Plaintiffs allege that "Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining

---

[141] *See, e.g.*, CB DPP Compl. at ¶¶ 175-78; CB EPP Compl. at ¶¶ 160-64; CB IRP Compl. at ¶¶ 149-52.

[142] DG DPP Compl. ¶ 153.

[143] *Id.*

[144] CB DPP Compl. ¶ 175.

[145] EC DPP Compl. ¶ 136.

them at supracompetitive levels."[146]  They also contend that the industry commentary allegations support their contention that "collusion is a plausible explanation" for the Group 1 drug price increases.[147]

## I.    MARKET ALLEGATIONS

Group 1 Plaintiffs allege the markets for the subject drugs were conducive to collusive activity.  They contend the relevant markets were mature, with multiple suppliers of equivalent generic products that are substitutable for one another (but that cannot be substituted for by other drugs on the market because of their pharmacological characteristics – i.e., subject to a high inelasticity of demand).[148]  Group 1 Plaintiffs also point to high barriers to market-entry in the form of high manufacturing costs, high costs for intellectual property, and expenses related to regulatory approval and oversight.[149]

Group 1 Plaintiffs allege Defendants have market power in the markets for the pharmaceutical products in the Group 1 cases, enabling them to increase prices without losing market share to other competitors.  They contend the relevant markets are susceptible to collusion, citing a high level of industry concentration with dwindling numbers of meaningful

---

[146] *Id.* at ¶ 124.

[147] *Id.* at ¶ 143-46; *see also* CB DPP Compl. ¶ 144 ("Defendants' public statements and admissions in their investor communications show that Defendants realized record revenues during the Class Period and emphasize a commitment to increasing generic pharmaceutical prices as well as maintaining them at supracompetitive levels.").

[148] *See, e.g.*, CB DPP Compl. ¶ 207(4) ("While there are other drugs on the market for the treatment of skin disorders there are significant barriers to changing treatments, and both patients and physicians are likely to prioritize medical considerations over price.").

[149] *Compare* CB EPP Compl. ¶ 67 ("Generic drug manufacturers may obtain FDA approval in an expedited fashion through the filing of an Abbreviated New Drug Application ('ANDA') that establishes that its product is bioequivalent to the branded counterpart") *with id.* at ¶ 187 ("the median time it takes for the FDA to approve a generic is now 47 months or nearly four years"); *see also* CB DPP Compl. ¶ 207(3) ("Any potential new entrant attracted to the Clobetasol market because of the price increase must go through the lengthy ANDA-approval process before coming to market."); CB IRP Compl. ¶ 173 ("manufacturing facilities must follow the FDA's rigorous Current Good Manufacturing Practice regulations").

competitors.[150]

Group 1 DPPs assert that "the usual inhibition of an oligopolist to unilaterally raise prices is embedded in the generic reimbursement system."[151]  Group 1 Plaintiffs explain that generic drug "manufacturers are usually constrained in their ability to price generic drugs by the Maximum Allowable Cost" or "MAC", a widely-used contractually-based payment model that sets the upper limit that a pharmacy will be paid under an insurance plan for procuring and dispensing a particular generic medication.[152]  They contend that MAC pricing gives manufacturers an incentive to price generic pharmaceutical products competitively in order to maintain pharmaceutical demand.[153]  They assert, however, that this effect of MAC pricing is lessened when generic drug manufacturers collectively increase their prices for a multi-source drug, allegedly making it more likely that any drastic price increases are the result of collusion

---

[150] *See* CB DPP Compl. ¶ 207(1) ("A small number of competitors (Defendants) control virtually all market share for Clobetasol."); CB EPP Compl. ¶ 178 (illustrating clobetasol Defendants' collectively dominant market share for the clobetasol formulations relevant to this litigation); CB IRP Compl. ¶ 186 ("Branded products generally maintain substantial price premiums over their generic counterparts, making them inapt substitutes even when generic prices soar."); DG DPP Compl. ¶ 64 (alleging digoxin Defendants dominated the digoxin market); DG EPP Compl. ¶ 142 ("By the third quarter of 2013, the Digoxin market was an effective duopoly and new entrants in 2014 were perceived as 'rational' competitors who would not disrupt the existing price structure."); DG IRP Compl. ¶¶ 111-13 (same); DV DPP Compl. ¶ 174(1) (alleging "Defendants together accounted for [a majority] of the market for" the relevant divalproex products during the putative class period); DV EPP Compl. ¶ 149 (citing "[t]he limited number of generic Divalproex ER manufacturers"); DX DPP Compl. ¶ 6 ("Defendants dominate the market for Doxycycline."); *id.* at ¶ 74 ("During the Class Period, Defendants Actavis, Par, Sun and West-Ward dominated Doxycycline Regular Release sales . . . ."); DX EPP Compl. ¶ 172 (alleging that "industry consolidation and exits have led to" Defendants' dominance in the generic doxycycline market without distinguishing between Doxy DR and Doxy RR); EC DPP Compl. ¶ 60 (alleging econazole Defendants' market dominance); EC EPP Compl. ¶ 72 ("Through their market dominance, Defendants have successfully foreclosed the market to rival competition, thereby maintaining and enhancing market power and enabling Defendants to charge Plaintiffs supracompetitive prices for generic Econazole."); PV DPP Compl. ¶ 63 (alleging pravastatin Defendants' market dominance) PV EPP Compl. ¶ 83 (alleging that Apotex, Glenmark, Lupin, Teva and Zydus collectively dominated the market for Pravastatin "in 2013, when the price hikes were first implemented").

[151] *See, e.g.,* DG DPP Compl. ¶ 218(9).

[152] *See, e.g.,* DG DPP Compl. ¶ 55.

[153] *See, e.g., id.* at ¶¶ 56, 58; *see also* DG IRP Compl. ¶ 61 ("Although MAC caps do not apply directly to manufacturers, these caps impose a restraint on manufacturers' prices.").

than conscious parallelism.[154]

## II.    DISCUSSION

This Opinion considers Group 1 Defendants' joint motions to dismiss the Sherman Act claims by the Group 1 Plaintiffs and, to the extent they pertain to Group 1 Plaintiffs' Sherman Act claims, the pending motions to dismiss:  (1) DPPs' clobetasol claims by Actavis, the Hi-Tech Defendants, Perrigo, and Wockhardt; (2) DPPs' digoxin claims by Impax, the Mylan Defendants, Par, and West-Ward; (3) DPPs' divalproex ER claims by Dr. Reddy's, the Mylan Defendants, and Zydus; (4) DPPs' doxycycline claims by Actavis, Mayne, the Mylan Defendants, Par, and West-Ward; (5) DPPs' econazole claims by Teligent; and (6) DPPs' pravastatin claims by Dr. Reddy's, Glenmark, and Sandoz.[155]  To the extent that Group 1 Defendants seek to dismiss the state law claims brought by the Group 1 EPPs and IRPs, their motions will be considered in a subsequent decision.  The Group 2 and 3 Plaintiffs' complaints are not addressed in this Opinion.

### A.    RULE 12(B)(6)

Because Group 1 Defendants move to dismiss Group 1 Plaintiffs' Sherman Act claims, their motions are to be judged pursuant to Federal Rule of Civil Procedure 12(b)(6).  Rule 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief can be granted where a plaintiff's "plain statement" lacks enough substance to show that he is

---

[154] *See, e.g.*, DG DPP Compl. ¶ 60 ("Knowing that they hold an overwhelming majority share of the market for Digoxin, Defendants had the capacity to dictate the market price and to influence the MAC prices set by [pharmacy benefits managers], but only if they acted collectively."); DG EPP Compl. ¶ 66 ("Because MAC prices further incentivize pharmacies to choose the lowest priced option, a generic manufacturer that increases its price for a drug should expect to lose sales to a competitor with a lower price. . . .  A manufacturer can only raise its price if it knows its competitors will raise their prices, too, *e.g.,* if they are conspiring."); DG IRP Compl. ¶ 61 ("In a market with MAC caps, it is unlikely that a generic drug manufacturer would risk raising its price unless it has been agreed with competitors that they will raise their prices, too.").

[155] These motions raise specific individual defenses, including defenses relating to particular Defendants' sales of specific drug formulations or the timing of price increases for drugs that they sold.

entitled to relief.[156]  It is important to bear in mind that "[a]lthough *Twombly's* articulation of the pleading stander for § 1 cases draws from summary judgment jurisprudence, the standards applicable to Rule 12(b)(6) and Rule 56 [summary judgment] motions remain distinct."[157] "[J]udging the sufficiency of a pleading is a context-dependent exercise."[158]  On a motion to dismiss, the Court "consider[s] plausibility, not probability . . . ."[159]  In other words, Plaintiffs are not required "to plead facts that, if true, definitely rule out all possible innocent explanations."[160] Rather, to withstand dismissal, Plaintiffs must "state enough facts to 'raise a reasonable expectation that discovery will reveal evidence of illegal agreement' even if the court believes such proof is improbable."[161]

Legal questions that depend upon a developed factual record are not properly the subject of a motion to dismiss.[162]  In the antitrust context, "a claim of conspiracy might appear plausible

---

[156] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

[157] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 n.21 (3d Cir. 2010); *see also In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015) ("Whether the [plaintiffs] will carry their burden of proof on the price-fixing claim is a decidedly different issue from whether they have alleged enough facts under Rule 8 to stay in court.").

[158] *W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 98 (3d Cir. 2010).

[159] *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 260 (3d Cir. 2017); *see also Twombly*, 550 U.S. at 570 (holding that a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face").

[160] *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 753 (E.D. Pa. 2014).

[161] *SigmaPharm, Inc. v. Mut. Pharm. Co.*, 772 F. Supp. 2d 660, 669 (E.D. Pa. 2011) (*quoting Twombly*, 550 U.S. at 556), *aff'd* 454 F. App'x 64 (3d Cir. 2011).

[162] *See, e.g.*, *TriState HVAC Equip., LLP v. Big Belly Solar, Inc.*, 836 F. Supp. 2d 274, 284 (E.D. Pa. 2011). Notwithstanding the present procedural posture of this litigation, as Plaintiffs note, Group 1 Defendants' motions are rife with citations to summary judgment decisions.  *See, e.g.*, DV DPP Opp. Br. at 12 n.15 (citing the following summary judgment cases cited in all or most joint briefs:  *Valspar Corp. v. E.I. Du Pont De Nemours & Co.*, 873 F.3d 185 (3d Cir. 2017*); In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383 (3d Cir. 2015); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004); *In re Baby Food Antitrust Litig.*, 166 F.3d 112 (3d Cir. 1999); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015); *Kleen Prods. LLC v. Int'l Paper*, No. 10 C. 5711, 2017 WL 3310975 (N.D. Ill. Aug. 3, 2017)).  As Divalproex DPPs argue, "Defendants skip over the fact that in both [*Valspar* and *In re Chocolate*] district courts found conspiracy plausible on a motion to dismiss."  DV DPP Opp. Br. at 12-13.

in light of the well-pled facts in the complaint, only to appear deficient at the summary judgment stage, when (1) the plaintiff can no longer rely on mere allegations but must adduce evidence, and (2) the defendant's uncontroverted evidence is also added to the picture."[163] "Whether plaintiffs can ultimately survive a motion for summary judgment after discovery is . . . of no consequence to the decision of the instant motion[s]."[164]

In determining whether to grant Group 1 Defendants' motions to dismiss, the Court must ordinarily consider only those facts alleged in the complaints, accepting the allegations as true and drawing all logical inferences in favor of the non-moving parties.[165] "[T]he allegations in [each] Complaint must be viewed as a whole."[166] In addition, "courts may consider documents *integral to or explicitly relied* upon in the complaint . . . or any undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document."[167] Courts are not, however, bound to accept as true legal conclusions couched as factual allegations.[168]

## B.  ALLEGATIONS IN THE STATE PLAINTIFFS' OPERATIVE COMPLAINT

The Court begins by considering whether Group 1 Plaintiffs can bolster the allegations in their own complaints by relying on the overarching conspiracy allegations in the State Plaintiffs' now-operative complaint, a pleading that was filed *after* the Group 1 complaints and after Group 1 Defendants filed their motions to dismiss.  Group 1 Plaintiffs' responses to Defendants'

---

[163] *In re Ins. Brokerage*, 618 F.3d at 323 n.21.

[164] *In re Se. Milk Antitrust Litig.*, 555 F. Supp. 2d 934, 949 (E.D. Tenn. 2008).

[165] *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir. 1994).

[166] *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 630 (E.D. Pa. 2010).

[167] *In re Asbestos Prods. Liability Litig. (No. VI)*, 822 F.3d 125, 133 n.7 (3d Cir. 2016) (emphasis in original) (brackets, internal quotation marks and citations omitted).

[168] *Twombly*, 550 U.S. at 555, 564.

motions ask the Court to rely on factual allegations included in that complaint to varying degrees. For example, in their responses to the motions to dismiss, Group 1 DPPs point to the State Plaintiffs' now-operative complaint

> which alleges a series of schemes to fix prices and allocate markets on many different generic pharmaceuticals, and that this was all part of an overarching scheme involving an "underlying code of conduct that is widespread in the generics industry"—"playing nice in the sand box." . . . This is an agreement that each generic manufacturer is entitled to its "fair share" based on a general industry desire 'to maintain or raise prices.'"[169]

Relying on the State Plaintiffs' allegations, Group 1 DPPs contend that the price spikes for the individual drugs addressed in each of their complaints were "not alone" but rather, were "part of a pattern in the U.S. generic pharmaceutical market focused between 2012 and 2015."[170] Group 1 DPPs also ask the Court to direct its attention to the State Plaintiffs' charts referencing "*thousands* of instances of phone and text communications among certain generic pharmaceutical manufacturers"[171] in support of their contention that there were frequent communications between Defendants.

Group 1 EPPs' responses to Defendants' motions also refer to the State Plaintiffs' now-operative complaint. They argue that the State Complaint provides "detailed evidence of unlawful agreements among Sandoz, Actavis, Sun, and Heritage" that the State Plaintiffs allege "were part of an overarching conspiracy of the corporate Defendants named in the Complaint to unreasonably restrain trade in the generic pharmaceutical industry."[172] For example, Doxycycline EPPs contend that the now-operative State Plaintiffs' complaint "outlines a strategy

---

[169] CB DPP Opp. Br. at 7 (*quoting* State Plaintiffs' CC ¶¶ 2, 14, 89-109).

[170] CB DPP Opp. Br. at 6.

[171] CB DPP Opp. Br. at 5 (emphasis in original); DG DPP Opp. Br. at 6; DX DPP Opp. Br. at 6; DV DPP Opp. Br. at 5; EC DPP Opp. Br. at 4; PV DPP Opp. Br. at 5.

[172] CB EPP Opp. Br. at 10.

by which Heritage communicated with competitors, including Defendants, and colluded on price increases for 15 different generic drugs," citing specific allegations therein.[173]

Similarly, in their responses, IRPs rely on the State Plaintiffs' allegations to support their contention that

> these price hikes were part of an overarching conspiracy in the generic drugs market which conspirators refer to as "playing fair" or "fair share," because the methods of the conspiracy involve fixing list prices, allocating customers via rigged bids or refusals to bid, reciprocally ceding market share across different drugs and formulations, and other tactics to raise prices and avoid price competition.[174]

The Court finds that it is not appropriate to consider the allegations in the State Plaintiffs' complaint in determining whether the Group 1 Plaintiffs' complaints are sufficient to withstand Group 1 Defendants' motions to dismiss. "[D]ocuments whose contents are alleged in the complaint and whose authenticity no party questions, but which are not physically attached to the pleading, may be considered."[175] However, allegations in the State Plaintiffs' operative pleading are just that—allegations—and are not facts "whose accuracy cannot reasonably be questioned."[176] In addition, allegations in the State Plaintiffs' complaint have questionable relevance to the Group 1 Plaintiffs' claims given that the generic drugs implicated in the State Plaintiffs' complaint—with the exception of doxycycline—are not the same as those addressed in the Class Plaintiffs' drug-specific Group 1 complaints. To the extent that any of Group 1 Plaintiffs' claims cannot withstand dismissal based on the allegations set forth in their respective

---

[173] DX EPP Opp. Br. at 6 (citing State Plaintiffs' Consolidated Amended Complaint).

[174] *See* CB IRP Opp. Br. at 1.

[175] *Pryor v. Nat'l Collegiate Athletic Ass'n*, 288 F.3d 548, 560 (3d Cir. 2002) (citation omitted).

[176] Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

complaints, Group 1 Plaintiffs will be given an opportunity to amend and where necessary, they may then support their claims with such further information as has become available to them.

## C. SUFFICIENCY OF GROUP 1 PLAINTIFFS' SHERMAN ACT CLAIMS

Section 1 of the Sherman Act prohibits "contract[s], combination[s], . . . or conspirac[ies], in restraint of trade or commerce."[177]  To plead a Section 1 claim, each of Group 1 Plaintiffs' complaints must include "enough factual matter (taken as true) to suggest that an agreement was made."[178]  "The crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."[179]  "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme."[180]  "[T]he issue is whether the pleading delineates to some sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy."[181]  "A plaintiff may plead an agreement by alleging direct or circumstantial evidence, or a combination of the two."[182]

"To evaluate the articulated allegations as to an individual defendant in the context of a multi-defendant, multi-faceted conspiracy, the conspiracy must not be 'compartmentalized.'"[183] Ultimately, Group 1 Plaintiffs must allege facts sufficient to make plausible their claims that

---

[177] 15 U.S.C. § 1.

[178] *Twombly*, 550 U.S. at 556; *see also In re Ins. Brokerage*, 618 F.3d at 315 ("the existence of an agreement is the hallmark of a Section 1 claim") (internal quotation marks and citation omitted).

[179] *Twombly*, 550 U.S. at 553 (internal quotation marks, citation, and alteration omitted).

[180] *W. Penn Allegheny*, 627 F.3d at 99.

[181] *In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 720 (E.D. Pa. 2011).

[182] *W. Penn Allegheny*, 627 F.3d at 99.

[183] *In re Processed Egg*, 821 F. Supp. 2d at 718; *see also In re Resistors Antitrust Litig.*, No. 15-cv-3820, 2017 WL 3895706 , at *3 (N.D. Cal. Sep. 5, 2017) ("It might be that some of these allegations, if viewed in isolation or as only a part of a subset of the allegations here, would not have been enough to cross the *Twombly* bar.  But complaints are not reviewed in paper thin slices. . . . [T]he Court evaluates all of the allegations as a whole . . . .").

Group 1 Defendants engaged in: (1) concerted actions; "(2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that [they were] injured as a proximate result of the concerted action."[184] "To provide reasonable notice to a specific defendant of the claim(s) against it, a complaint must plausibly suggest that the individual defendant actually joined and participated in the conspiracy."[185] Although Group 1 Plaintiffs are not required to "plead each defendant's involvement in the alleged conspiracy in elaborate detail,"[186] "[t]he Court properly looks for more than mere repetitive generic reference to 'Defendants' tacked on to a conclusory verb form to connect an individual defendant to an actual agreement in an antitrust conspiracy."[187]

### 1. DIRECT EVIDENCE

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to plead a claim under Section 1 of the Sherman Act.[188] Group 1 clobetasol, digoxin, divalproex ER, econazole, and pravastatin Plaintiffs do not ask the Court to find that they have stated Sherman Act claims based on direct evidence. The doxycycline Plaintiffs do, citing the Malek and Glazer guilty pleas.[189]

---

[184] *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (*citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.*, 998 F.2d 1224, 1229 (3d Cir. 1993) and *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1364 (3d Cir. 1992)).

[185] *In re Processed Egg*, 821 F. Supp. 2d at 719; *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1117 (N.D. Cal. 2008) ("[T]he complaint must allege that each individual defendant joined the conspiracy and played some role in it because, at the heart of an antitrust conspiracy is an agreement and a conscious decision by each defendant to join it.").

[186] *In re TFT-LCD*, 586 F. Supp. 2d at 1117.

[187] *In re Processed Egg*, 821 F. Supp. 2d at 720; *see also In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008) ("[S]prinkling a complaint with conclusory assertions that a party was a 'participant in coordinated conduct' or a 'conspirator' or acted in 'concert' with others does not make the requisite showing of entitlement to relief mandated by Rule 8(a)(2).")

[188] *In re Ins. Brokerage*, 618 F.3d at 323.

[189] Doxycycline Defendants argue that the Malek and Glazer guilty pleas are not sufficient to allege direct

"Direct evidence of a conspiracy is evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."[190] Examples are "a document or conversation explicitly manifesting the existence of the agreement in question . . . ."[191] "[P]articipation in a trade group association and/or attending trade group meetings, even those meetings where key facets of the conspiracy allegedly were adopted or advanced, are not enough on their own to give rise to the inference of agreement to the conspiracy."[192] Although Plaintiffs need not "plead specific back-room meetings between specific actors at which specific decisions were made" to withstand dismissal on the basis of direct evidence, more is required than non-specific allegations of attendance or participation.[193]

The answer to the question of whether the doxycycline Plaintiffs have sufficiently alleged direct evidence of a conspiracy is complicated. Although they purport to state a claim for a single doxycycline conspiracy, doxycycline Plaintiffs also acknowledge that there are distinctions between Doxy DR and Doxy RR, the Defendants responsible for each product, and the prices for the two products. Nevertheless, doxycycline DPPs argue that the guilty pleas of "Heritage's former GEO, Glazer, and its former president Malek . . . to felony charges that they

---

evidence in support of Group 1 Plaintiffs' claims because "[n]either the transcripts from the guilty plea hearings, nor any other publicly available documents from the criminal proceedings, provide any specifics as to the companies or individuals with whom Malek and Glazer allegedly conspired, when the alleged conspiracies were formed, or the scope of any agreements." DX Defs.' Mem. in Support of Mot. to Dismiss DX DPP Compl. at 26. The Court agrees that the Malek and Glazer guilty pleas are not sufficient to allege direct evidence of a Sherman Act violation other than for Plaintiffs' claims regarding Doxy DR, as is further set forth below. Nevertheless, this does not mean that the guilty plea allegations are irrelevant to Group 1 Plaintiffs' other claims.

[190] *Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 225 (3d Cir. 2011) (internal quotation marks and citations omitted).

[191] *In re Ins. Brokerage*, 618 F.3d at 324 n.23.

[192] *In re Processed Egg*, 821 F. Supp. at 722 (emphasis omitted); *see also In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1023 (N.D. Cal. 2007) ("Attendance at industry trade shows and events is presumed legitimate and is not a basis from which to infer a conspiracy, without more.").

[193] *In re Graphics Processing Units*, 527 F. Supp. 2d at 1024.

conspired with competitors concerning 'doxycycline hyclate'" constitute direct evidence of a doxycycline conspiracy that encompasses both Doxy DR and Doxy RR.[194]  Likewise, doxycycline EPPs contend that the guilty pleas are sufficient to allege direct evidence of a single doxycycline conspiracy because "the plea agreements are not limited to Doxy DR, but instead cover "doxycycline hyclate.'"[195]  Doxycycline IRPs do not ask the Court to reach so far.  Instead, they argue that they "have alleged direct evidence of a conspiracy to allocate customers, rig bids, and fix prices for doxycycline DR," noting that Malek and Glazer "have pleaded guilty to this conduct" and that "[t]he only other manufacturers of doxycycline DR were Defendants Mylan and Mayne, and IRPs allege evidence of multiple collusive communications between Heritage and Mylan or Mayne and allege specific details that illustrate how their anticompetitive agreements were implemented."[196]

Doxycycline Defendants argue that the Glazer and Malek guilty pleas are not sufficient to plausibly allege "direct evidence of a conspiracy regarding Doxy RR (a product that Heritage never made or sold)," especially where "there is no [explicit] allegation that Heritage's former executives conspired with respect to Doxy RR."[197]  The Court agrees.  Doxycycline Plaintiffs have not alleged a Doxy RR conspiracy based on direct evidence.

Doxycycline Defendants also argue that doyxycyline Plaintiffs' complaints fall short of alleging direct evidence of a Doxy DR conspiracy, noting that while "Plaintiffs cite supposed communications between Mayne and Heritage, and separately between Mylan and Heritage," there are no details alleged regarding the communications and there are no allegations

---

[194] DX DPP Opp. Br. at 17.

[195] DX EPP Opp. Br. at 5.

[196] DX IRP Opp. Br. at 3.

[197] DX Defs.' DPP Reply Br. at 7-8.

"suggesting a *three-way* meeting of the minds."[198] Doxycycline Defendants ask too much in the current procedural posture of this litigation. Such "[s]pecific facts are not necessary; the [complaints] need only give the defendant fair notice of what the claim is and the grounds upon which it rests."[199] When considered in the context of Glazer and Malek's guilty pleas, doxycycline Plaintiffs' allegations of multiple contacts between Heritage and both Mayne and Mylan concerning Doxy DR are sufficient to give the Doxy DR Defendants notice of the basis for doxycycline Plaintiffs' claims.[200] Doxycycline Plaintiffs have plausibly alleged the existence of a Doxy DR conspiracy based on direct evidence and may proceed to discovery with respect to their Doxy DR claims.

### 2. CIRCUMSTANTIAL EVIDENCE

Where a complaint does not allege direct evidence of a Section 1 violation, as is the case here for all of the Group 1 drugs with the exception of Doxy DR, Plaintiffs may withstand dismissal by relying on allegations of "circumstantial evidence (and the reasonable inferences that may be drawn therefrom) to prove a conspiracy."[201] "[H]eightened fact pleading of specifics" is not required to state a claim, but allegations of parallel behavior alone are not enough.[202] Plaintiffs may allege parallel conduct plus "a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent

---

[198] *Id.* at 2; *see also* DX Mayne Br. in Support of Mot. to Dismiss at 8 ("The Complaints fail to allege . . . that Mayne knew of the agreements between Heritage and Mylan, or that Mylan knew of the agreements between Heritage and Mayne. The Complaints also fail to allege that Mayne and Mylan depended on each other to achieve a common goal related to Doxy DR."); DX Mylan Br. in Support of Mot. to Dismiss at 6 ("Plaintiffs fail to identify any meeting, communication, or agreement involving Mylan and *both* Heritage *and* Mayne, and therefore fail to allege a conspiracy encompassing all three companies.") (emphasis in original).

[199] *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation marks, citation and ellipses omitted).

[200] *See, e.g.* DX DPP Compl. at ¶¶ 106-12.

[201] *SigmaPharm, Inc.*, 772 F. Supp. 2d at 670 (internal quotation marks and citation omitted).

[202] *Twombly*, 550 U.S. at 557, 570.

action."[203] The necessary context may be shown through allegations of "plus factors" that "serve as proxies for direct evidence of an agreement."[204] The plus factors "show that the allegedly wrongful conduct of the defense was conscious and not the result of independent business decisions of the competitors."[205]

### i.    **Parallel Conduct**

Group 1 Defendants contend that dismissal of Group 1 Plaintiffs' claims is warranted because they have not pled parallel conduct. Several Group 1 Defendants argue that Group 1 Plaintiffs' claims should be dismissed as against them because they either were not present in the market when their drug prices first increased or because they did not increase their prices at the same time as other Group 1 Defendants.[206] Still others argue that dismissal is warranted because the pricing data Group 1 Plaintiffs use to support their claims shows divergent prices between relevant Defendants.[207] Indeed, Group 1 Defendants' pricing practices are not all alleged to have

---

[203] *Id.* at 557.

[204] *In re Flat Glass*, 385 F.3d at 360.

[205] *In re Baby Food Antitrust Litig.*, 166 F.3d at 122.

[206] *See, e.g.*, CB Actavis Mem. in Support of Mot. to Dismiss at 4 ("Actavis could not have agreed with the other Defendants to raise prices for Clobetasol in June 2014, because Actavis did not sell Clobetasol in June 2014 save for its *de minimis* sales of 50 ML solution, which are not alleged to have been a part of the June 2014 Price Increase."); CB Akorn Mem. in Support of Mot. to Dismiss at 3 ("[T]he tables demonstrate that Akorn did not increase its WAC prices for all Clobetasol formulations until August 9, 2014, over two months after the first Defendant initiated a WAC price increase on June 3, 2014."); CB Perrigo Mem. in Support of Mot. to Dismiss at 3 ("The WAC pricing chart for Clobetasol Gel included in the IRP complaint shows that Perrigo's prices were much lower than other Defendants['] prices during most of the alleged 'conspiracy period,' rendering entirely implausible any claim that Perrigo participated in the conspiracy . . . ."); DV Dr. Reddy's and Zydus Mem. in Support of Mot. to Dismiss at 4 ("Dr. Reddy's and Zydus did not enter the generic Divalproex market until . . . two months after Mylan and Par increased their WACs.") (emphasis omitted).

[207] *See, e.g.* DV Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 21 ("But far from moving in lockstep, the Divalproex prices alleged . . . in several instances become *less* uniform following the alleged collusive agreement."); DV Defs.' Mem. in Support of Mot. to Dismiss EPP Compl. at 6-7 ("Data cited in the Complaint shows how disparate the alleged price increases were, both in time and value. This is not parallel pricing."); PV Defs.' Mem in Support of Mot. to Dismiss DPP Compl. at 13 ("Rather than establish that Defendants acted in a coordinated fashion, the disparity among DPPs' allegations regarding the individual Defendants['] purported 'effective prices' and WAC benchmarks suggests the exact opposite – that Defendants set their pravastatin prices independently.").

*exactly* mirrored those of their peers. However, "Plaintiffs are not required to plead simultaneous price increases—or that the price increases were identical—in order to demonstrate parallel conduct."[208] Rather, they must allege price increases that are "reasonably proximate in time and value."[209] Even on the developed evidentiary record at summary judgment, the Third Circuit has found that a showing of parallel pricing requires only evidence that defendants "acted similarly," and not evidence that they charged the same prices or engaged in identical conduct.[210] With that in mind, the Court considers the following challenges to Group 1 Plaintiffs' allegations of parallel conduct.

Group 1 Defendants argue that Group 1 Plaintiffs' drug price allegations are not sufficient to support their parallel pricing claims.[211] For most of the Group 1 Defendants,

---

[208] *In re Blood Reagents*, 756 F. Supp. 2d at 630 (*citing In re Baby Food*, 166 F.3d at 132); *see also In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 722 n.12 (S.D.N.Y. 2017) ("It is also immaterial at this stage of the litigation that Defendant Mylan raised its prices of Propranolol tablets slightly later than its alleged co-conspirators."); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 151 (E.D.N.Y. 2010) ("[I]llegal price fixing need not be exactly simultaneous and identical in order to give rise to an inference of agreement.") (citing *City of Moundridge v. Exxon Mobil Corp.*, No. 04- 940, 2009 WL 5385975, at *5 (D.D.C. Sept. 30, 2009) ("Price-fixing can occur even though the price increases are not identical in absolute or relative terms."), aff'd 409 F. App'x 362 (D.C. Cir. 2011)).

[209] *In re Chocolate Confectionary Antitrust Litig.*, 999 F. Supp. 2d 777, 787 (M.D. Pa. 2014), *aff'd*, 801 F.3d 383, 392 (3d Cir. 2015) (defining parallel price increases as those "in which one company raises prices and its rivals follow"); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) ("parallel conduct, such as competitors adopting similar policies around the same time in response to similar market conditions, may constitute circumstantial evidence of anticompetitive behavior"); *In re Pool Prod. Distrib. Mkt. Antitrust Litig.*, 158 F. Supp. 3d 544, 559 (E.D. La.) ("That the Manufacturer Defendants' announcements and effective price increases took place over the course of several months does not disprove that the Manufacturer Defendants engaged in parallel behavior."), *appeal dismissed* No. 16-30855 (5th Cir. Oct. 27, 2016); *In re Text Messaging Antitrust Litig.*, No. 08-7082, 2009 WL 5066652, at *5 (N.D. Ill. Dec. 10, 2009) (finding price increases occurring within a period of 10 months were sufficiently parallel to permit the plaintiffs' price-fixing claim to withstand dismissal); *In re Delta/Airtran Baggage Fee Antitrust Litig.*, 245 F. Supp. 3d 1343, 1371 (N.D. Ga. 2017) (explaining plaintiffs must show that "defendants engaged in parallel pricing for some of their . . . products for substantial periods of time") (internal quotation marks and citation omitted; ellipses in original).

[210] *Petruzzi's IGA Supermarkets, Inc.*, 998 F.2d at 1243.

[211] As noted above, Group 1 Defendants rely heavily on decisions that evaluated evidence on summary judgment. *See, e.g.*, CB Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 11 (citing summary judgment decisions including, *inter alia*, *In re Baby Food*, 116 F.3d 112 and *In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175 (E.D. Pa. 2016)). Plaintiffs' allegations need not meet the summary judgment bar on a motion to dismiss.

Group 1 Plaintiffs' complaints rely on multiple data sources to illustrate their claims of substantial price increases occurring over a short time period after a period of stable, lower prices: pricing information from IMS Health, NADAC and WAC. Group 1 Defendants argue that Group 1 Plaintiffs cannot rely on this data to support their claims because it does not reflect "the actual prices paid by consumers,"[212] However, as Group 1 Plaintiffs contend, Group 1 Defendants' transactional data is not public information,[213] leaving Group 1 Plaintiffs with no choice but to look for alternative information to substantiate their drug pricing allegations. To withstand Group 1 Defendants' motions to dismiss, it is enough that Group 1 Plaintiffs have alleged that the IMS Health, NADAC and WAC data are widely used in the industry and are generally considered to be reliable.[214] While more may be required on summary judgment,[215] no more is required now.

With respect to timing, Group 1 Plaintiffs sufficiently plead parallel conduct at this stage of the litigation where they allege that a "late" Defendants' pricing behavior essentially matched that of the other Defendants.[216] As Group 1 Plaintiffs argue, "[b]eing a latecomer to a conspiracy

---

[212] *See, e.g.*, DV Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 23.

[213] *See, e.g.*, CB EPP Compl. ¶ 75 ("Because the prices paid by purchasers of generic drugs differ at different levels of the market and most of the transactions occur between private parties according to terms that are not publicly disclosed, the price of a given drug is not always obvious.").

[214] *See In re Propranolol*, 249 F. Supp. 3d at 720 n.8 ("While discovery may ultimately prove plaintiffs' pricing data less than accurate, on a motion to dismiss the Court takes all well-plead allegations as true . . . ."); *cf.*, *In re Flat Glass*, 385 F.3d at 362-63 ("Sellers would not bother to fix list prices if they thought there would be no effect on transaction prices.")(internal quotation marks, citation, and alteration omitted).

[215] *See In re Baby Food*, 166 F.3d at 130, 132 (affirming grant of summary judgment because Defendants had shown that they "engaged in independent pricing determined by market conditions at the time, profit margins, and the effect of price increases or decreases on sales volume and distribution" where their evidence included list pricing data showing that "sometimes competitors did not follow price increases at all, other times they followed by less, sometimes they the same amount, and sometimes they followed only in certain geographic areas")

[216] *See Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. 08-42, 2013 WL 6481195, at *22 (E.D.N.Y. Sept. 20, 2013) (determining that the plaintiffs' allegation that a defendant "later" joined the alleged conspiracy was made plausible by their allegations that the defendant followed the other defendants' conduct

furnishes no defense—joint and several liability attaches to all conspirators regardless of when they joined or participated in the common scheme."[217]

Thus the Court rejects Wockhardt Defendants' argument that clobetasol Plaintiffs' claims should be dismissed against them because "[t]he data cited . . . show that Wockhardt raised its [clobetasol] prices months after its competitors and that the prices varied widely from those set by the other competitors."[218]  The data cited in the clobetasol EPP complaint appears to show that Wockhardt did not raise its prices in the same month as its competitors or to the exact level as its competitors.[219]  However, the clobetasol EPPs also allege that "[t]he market-wide Clobetasol price increases are the result of Defendants Hi-Tech, Sandoz, Taro, and Wockhardt increasing their respective Clobetasol prices at substantially the same time to substantially similar levels in the summer of 2014" and the cited pricing data for the Wockhardt Defendants follows a pattern similar to that for other clobetasol Defendants.[220]  For the same reason, the Court also rejects the Hi-Tech Defendants' argument that clobetasol Plaintiffs have not stated a claim against them because their allegations show that Akorn raised its pricing "weeks or months" after the other clobetasol Defendants, and that when it did so, it did not always increase its prices to the same peak levels as the other Defendants.[221]  At this stage of the litigation, clobetasol Plaintiffs' allegations with respect to the Wockhardt Defendants and Akorn, viewed in

---

after a certain date), *report and recommendation adopted*, No. 08-42, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014).

[217] CB EPP Opp. Br. at 11; *c.f.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 538 (D.N.J. 2004) ("a co-conspirator is liable for all acts committed in furtherance of a conspiracy, regardless of when it entered the conspiracy").

[218] CB Wockhardt Mem. in Support of Mot. to Dismiss at 1-2.

[219] CB EPP Compl. ¶ 98.

[220] *Id.* at ¶ 94.

[221] CB Hi-Tech Defendants' Mem. in Support of Mot. to Dismiss at 2-5.

the entire context of each of the complaints are enough to plausibly plead that these Defendants engaged in coordinated conduct.

Whether clobetasol Plaintiffs have sufficiently pled that Perrigo and/or Actavis engaged in coordinated conduct is a closer question. Clobetasol IRPs allege that Perrigo, which only produced clobetasol gel, and not the other four formulations implicated in clobetasol Plaintiffs' complaints, "did not increase the price of its Clobetasol gel product until March 2016," two years after other clobetasol Defendants are alleged to have implemented steep price hikes.[222] Similarly, of the five clobetasol formulations at issue in the complaints, Actavis is only alleged to have manufactured or sold two, not entering the market for clobetasol cream until March 2015, and entering the market for clobetasol solution in June 2015 – nearly ten months and one year, respectively, after the alleged June 2014 clobetasol price increases.[223] While the pricing allegations against Perrigo and Actavis, in isolation, may be insufficient to aver parallel conduct given the time lapse between their price increases and those of the other Defendants, the Court must consider them in the entire context of the allegations in the clobetasol complaints. Group 1 Plaintiffs allege that Perrigo increased its clobetasol price during a time when Doug Boothe, then its Executive Vice President and General Manager, sat on the board of the GPhA alongside Heritage's CEO Glazer and executives of other Defendants.[224] Boothe, who served on the GPhA board on behalf of Perrigo from 2013-2014, is also alleged to have served on the GPhA board in

---

[222] CB IRP Compl. ¶¶ 81-82.

[223] CB IRP Compl. ¶ 74 ("Actavis had *de minimis* sales of some Clobetasol formulations prior to and during the initial price increases, but began selling cream in March 2015 and increased its sales of solution in August 2015."); *see also id.* at ¶¶ 81-82, 85, 106.

[224] *See* CB DPP Compl. ¶¶ 109-10.

2012 when he was Actavis' President and CEO.[225]  Clobetasol Plaintiffs have also alleged that

Perrigo and Actavis were "regular members of the GPhA during the Class Period,"[226] and that

representatives from Actavis and Perrigo attended GPhA, NACDS, and other meetings during

the time of the clobetasol price increases.[227]  Keeping in mind that allegations against individual

defendants "must not be 'compartmentalized,'"[228] the Court is satisfied that clobetasol Plaintiffs'

allegations are sufficient to plead parallel conduct.

Also, digoxin Plaintiffs have sufficiently alleged that Mylan and Par engaged in parallel

conduct despite their arguments to the contrary.  Digoxin Plaintiffs allege that Mylan exited the

digoxin market in 2009 and did not return to that market until at least early 2014, more than a

year after the alleged sharp increase in digoxin prices.[229]  But they also allege that when Mylan

returned to the market, "it entered the market at supracompetitive prices, comparable to the other

Defendants."[230]  Moreover, digoxin Plaintiffs allege that Mylan sent key pricing executives to

trade association meetings leading up to the October 2013 digoxin price increases and also in

early 2015, just before it re-entered the market.[231]  Its alleged pricing behavior thereafter is

sufficiently coordinated with that of the other digoxin Defendants for digoxin Plaintiffs to have

---

[225] *See id.* ¶ 109.  In 2013, Actavis was represented on the GPhA board of directors by Charlie Mayr, its Chief Communications Officer – Global.  *Id.*

[226] *Id.* ¶ 108; CB EPP Compl. ¶ 124; *see also* CB IRP Compl. ¶ 130 ("Defendants are current or recent regular members of the GPhA.").

[227] *See* CB DPP Compl. ¶¶ 119-36.

[228] *In re Processed Egg*, 821 F. Supp. 2d at 718; *see also In re Resistors*, 2017 WL 3895706, at *3  ("It might be that some of these allegations, if viewed in isolation or as only a part of a subset of the allegations here, would not have been enough to cross the *Twombly* bar.  But complaints are not reviewed in paper thin slices. . . . [T]he Court evaluates all of the allegations as a whole . . . .").

[229] DG DPP Compl. ¶ 67; DG EPP Compl. ¶ 81; DG IRP Compl. ¶ 70.

[230] DG DPP Compl. ¶ 80.

[231] *Id.* at. ¶¶ 115-18, 129-32.

pled that Mylan engaged in parallel conduct.[232]

Like Mylan, Par and West-Ward were out of the digoxin market when prices are alleged to have sharply increased.[233] Par argues that dismissal of the digoxin Plaintiffs' claims against it is warranted because its market "entry occurred months after the alleged Lannett and Impax price increases."[234] West-Ward contends that digoxin Plaintiffs' allegations with respect to its pricing conduct are insufficient because they "merely describe[ ] behavior expected of any market entrant in this industry . . . ."[235] However, Digoxin DPPs allege Par "entered the market in early 2014" and that when it did, it did so "at the agreed-upon artificially inflated prices.[236] They also allege that West-Ward returned to the digoxin market in April 2014, selling its 0.55 mg tablet at a price that was "an extraordinary increase over its pre-conspiracy prices" and "comparable to Defendants' peak prices."[237] While Par and West-Ward may ultimately show that there is an alternative explanation for their pricing behavior upon their entry into the digoxin market, the Court finds that digoxin Plaintiffs' allegations of parallel conduct are sufficient in the current procedural posture of this litigation.

Divalproex Defendants argue that their price increases can be explained by Wockhardt's exit from the Divalproex market after Wockhardt suffered significant regulatory problems in 2013.[238] They argue that divalproex Plaintiffs' claims are insufficient because they "ignore

---

[232] *See id.* at ¶ 68.

[233] *Id.* at ¶¶ 77-79.

[234] DG Par Mem. in Support of Mot. to Dismiss at 4.

[235] DG West-Ward Mem. in Support of Mot. to Dismiss at 6.

[236] DG DPP Compl. ¶ 77.

[237] *Id.* at ¶ 79.

[238] DV Mylan Mem. in Support of Mot. to Dismiss at 2-3; DV Dr. Reddy's and Zydus Mem. in Support of Mot. to Dismiss at 2-4.

Wockhardt's exit and the effect it had" on the market.[239] They contend that divalproex Plaintiffs have not sufficiently alleged parallel pricing because the pricing data allegations merely "demonstrate[ ] that Mylan and Par each unilaterally responded to Wockhardt's sudden exit" and "[i]ncreasing prices are competitive markets' natural reaction to unprecedented supplier exits."[240] While this may ultimately prove to be the case, Plaintiffs are not required "to come up with possible explanations . . . and then rebut those explanations in response to a motion to dismiss."[241] Divalproex Plaintiffs have pled facts sufficient to allege that divalproex Defendants "acted similarly," including their allegations with respect to Dr. Reddy's and Zydus, who are alleged to have entered the divalproex market three months after the Wockhardt import ban and two months after Mylan and Par are alleged to have increased their WACs.[242] No more is required now.

Doxycycline Plaintiffs' complaints include effective pricing data—relevant only to the Doxy RR Defendants[243]— that illustrates a sudden and nearly contemporaneous shift in prices

---

[239] DV Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 16.

[240] *Id.* at 23.

[241] *In re Lipitor*, 868 F.3d at 256.

[242] *See* DV DPP Compl. ¶ 78 ("Mylan and Par set identical WACs within a couple weeks of each other at the start of the Class Period; and Dr. Reddy's and Zydus matched those WACs in August, around the time they each entered the market:"); *see also* DV EPP Compl. ¶ 91; DV IRP Compl. ¶ 68.

[243] Notably, doxycycline Plaintiffs do not explicitly allege *any* specific price increases arising from the alleged Doxy DR scheme. *See, e.g.,* DX DPP Compl. ¶¶ 106-13. Their complaints cite IMS data only for Defendants who manufactured Doxy RR: Actavis, Par, Sun, and West-Ward. *See* DX DPP Compl. ¶¶ 77-89 (citing IMS data for Actavis, Sun, Par and West-Ward, and not for Heritage, Mayne, or Mylan); DX EPP Compl. ¶¶ 84-93 (citing IMS data); DX IRP Compl. ¶¶ 77-91 (citing IMS Data). Doxycycline Plaintiffs' complaints cite no effective pricing data for any of the Doxy DR manufacturers (Heritage, Mayne and Mylan). Likewise, doxycycline Plaintiffs' complaints do not include any WAC pricing allegations for Defendants who manufactured Doxy DR (Heritage, Mayne and Mylan). Instead, they only include WAC pricing allegations for Actavis, Sun, and West-Ward. DX DPP Compl. ¶ 91; DX EPP Compl. ¶¶ 94-96; DX IRP Compl. ¶ 93. Plaintiffs' Doxy DR claims are, however, sufficient to withstand dismissal for the reasons set forth above, and thus doxycycline Plaintiffs' failure to allege Doxy DR pricing data does not require dismissal of these claims.

for relevant formulations of the drug between 2012 and 2013.[244]   It also shows that when Par subsequently entered the Doxy RR market in 2014, Par set prices that were similar to those of the other Doxy RR Defendants.[245]  Doxycycline Plaintiffs also bolster their effective pricing allegations with WAC pricing data for the Doxy RR Plaintiffs other than Par.[246]  Doxycycline Plaintiffs' pricing allegations are sufficient to allege coordinated conduct with respect to the alleged Doxy RR scheme (but not the alleged Doxy DR scheme).

With respect to econazole Plaintiffs' pricing allegations, Perrigo's and Taro's price increases allegedly occurred almost simultaneously, with Teligent's following several months behind.[247]  Teligent's alleged econazole price increases did not precisely match the alleged price increases by either Perrigo or Taro, but the manufacturers' peak prices were within close range of each other for each relevant drug formulation.[248]  These differences alone do not provide a basis for dismissal.

The Court is similarly unpersuaded by pravastatin Defendants' argument that "DPPs are unable to claim that each Defendant raised its 'effective' pravastatin prices at the same time."[249]  Pravastatin Defendants concede that "allegations of sequential (as opposed to simultaneous) price increases may in some circumstances qualify as parallel . . . ," but argue that pravastatin

---

[244] *See* DX DPP Compl. ¶ 77.

[245] *Id.*

[246] Doxycycline Plaintiffs' complaints do not include WAC pricing allegations for Par.  *See* DX DPP Compl. ¶ 90; DX EPP Compl. ¶¶ 89, 94-95; DX IRP Compl. ¶ 92; *see also* DX Par Mem. in Support of Mot. to Dismiss at 4 ("Plaintiffs have alleged no facts about Par's WAC prices.").  The absence of such allegations is not fatal to Doxycycline Plaintiffs' claims against Par at this stage of the litigation.

[247] *See* EC DPP Compl. ¶ 63; EC IRP Compl. ¶ 65.

[248] *See* EC EPP Compl. ¶¶ 78, 82, 86.

[249] PV Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 14.

Plaintiffs' price shift allegations are insufficiently proximate in time.[250]  The Court disagrees;

pravastatin Plaintiffs "have alleged sufficiently *similar* price increases for Defendants'

Pravastatin within a few months of each other both in terms of their effective prices, as measured

by IMS data and corroborated by list or WAC prices."[251]  This includes pricing data specific to

Glenmark, which argues that "Plaintiffs' allegations with respect to Glenmark's pricing behavior

during the relevant time period fail to plausibly tie Glenmark to the alleged conspiracy."[252]  At

this stage of the case, it is enough that plaintiffs have shown that Glenmark's pravastatin pricing

closely tracked that of the other pravastatin Defendants.[253]  That Glenmark may have been the

price leader for several pravastatin dosages is not enough to require dismissal of its claim.[254]

Pravastatin plaintiffs have likewise met their burden with respect to their claims against Sandoz,

which did not enter the market until sometime in 2014—after the allegedly conspiratorial 2013

increase in pravastatin prices.[255]  When Sandoz did enter the pravastatin market, pravastatin

Plaintiffs allege that it did so at prices comparable to the other pravastatin Defendants' post-

increase prices.[256]  Viewed in the context of all of pravastatin Plaintiffs' allegations, this is

enough at this stage of the case.

Any other timing arguments made by Group 1 Defendants that are not specifically

addressed here involve relatively short periods of time between Group 1 Defendants' alleged

---

[250] *Id.*

[251] PV DPP Opp. Br. at 15.

[252] *See* PV Glenmark Mem. in Support of Mot. to Dismiss at 1, 4.

[253] *See* PV DPP Compl. ¶¶ 65-69; PV EPP Compl. ¶ 97;

[254] *See* PV Glenmark Mem. in Support of Mot. to Dismiss at 5-7.

[255] *See* PV DPP Compl. ¶¶ 65, 86; PV EPP Compl. ¶ 97; PV IRP Compl. ¶¶ 82, 92.·

[256] *See* PV DPP Compl. ¶ 86; PV EPP Compl. ¶ 97; PV IRP Compl. ¶ 109.

pricing actions or small variations in value that warrant no further discussion. With the exception of the Doxy DR claims, Group 1 Plaintiffs have sufficiently alleged information illustrating similar price increases during a concentrated timeframe as is required to support their contention that the Group 1 Defendants engaged in parallel conduct with regard to their respective drugs. While more detailed timing and price value information may be necessary to support their claims on summary judgment,[257] Group 1 Defendants' attacks on Group 1 Plaintiffs' pricing allegations as being insufficiently parallel are unavailing at this stage of the litigation. But this does not end the Court's analysis.

### ii.  **Plus Factors**

Group 1 Plaintiffs' parallel pricing allegations are not enough on their own for their claims to withstand Defendants' motions. "[A] claim based on parallel—even consciously parallel—conduct alone [is] insufficient to survive dismissal . . . ."[258] "An allegation of parallel conduct is . . . much like a naked assertion of conspiracy in a § 1 complaint:  it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of entitlement to relief."[259] The Third Circuit has identified at least three "plus factors" that may support a finding that there is a suggestion of a preceding agreement:  "(1) evidence that the defendant had a motive to enter into a price fixing conspiracy; (2) evidence that the defendant acted contrary to its interests; and (3) evidence implying a

---

[257] *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 132 (3d Cir. 1999) (considering detailed pricing evidence and explaining that "parallel pricing does not require 'uniform prices'").

[258] *Lifewatch Servs. Inc. v. Highmark Inc.*, --- F.3d ---, No. 17-1990, 2018 WL 4087882, at *6 (3d Cir. Aug. 28, 2018).

[259] *Twombly*, 550 U.S. at 557; *cf.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 429 (4th Cir. 2015), as amended on reh'g in part (Oct. 29, 2015) ("[T]he plaintiff's initial showing of parallel conduct is only an initial step in a multi-step process.  It is the additional steps required of an antitrust plaintiff that are meant to ensure that innocent business activities are not tarred as antitrust violations, whether at the motion-to-dismiss stage or later.").

traditional conspiracy."[260] "[P]lus factors are simply circumstances in which the inference of independent action is less likely than that of concerted action."[261] Through Group 1 Plaintiffs' allegations in support of these plus factors, the Court finds that, with one exception, they "have situated [their] allegation[s] of parallel conduct in the context of other averments plausibly suggesting concerted action."[262] In other words, Group 1 Plaintiffs' complaints generally include the required added factual enhancement that is necessary for their claims to withstand dismissal.

### a. <u>Motive</u>

With respect to the first plus factor—motive, Group 1 Plaintiffs' allegations describe the market for each of the Group 1 drugs "as one that is highly concentrated, contains high barriers to entry, has inelastic demand, lacks reasonable substitutes, and is based on a standardized product . . ."[263] "High barriers to entry . . . make an industry more conducive to collusion."[264] They also allege that "[o]ver time, generics' pricing nears the generic manufacturers' marginal costs."[265] "Declining prices or profits in a market make 'price competition more than usually risky and collusion more than usually attractive.'"[266] Group 1 Plaintiffs' pleadings plausibly outline a regulatory regime that could reduce Group 1 Defendants' profits by driving down generic drug prices over time and which would give them a common motive to set drug prices.

---

[260] *In re Ins. Brokerage*, 618 F.3d at 322.

[261] *Avenarius v. Eaton Corp.*, 898 F. Supp. 2d 729, 738 (D. Del. 2012); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015) ("plus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action").

[262] *In re Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 371.

[263] *In re Blood Reagents*, 756 F. Supp. 2d at 631.

[264] *In re Blood Reagents Antitrust Litig. (II)*, 266 F. Supp. 3d 750, 772 (E.D. Pa. 2017) (*citing In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 65 (2d Cir. 2012)).

[265] *See, e.g.,* CB DPP Compl. ¶ 56.

[266] *In re Blood Reagents Antitrust Litig. (II)*, 266 F. Supp. 3d at 772 (*quoting In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 657 (7th Cir. 2002)).

### b.     Actions Against Self-Interest

With respect to the second plus factor, Group 1 Plaintiffs have also plausibly alleged that Group 1 Defendants' pricing practices would be irrational in a competitive market. Group 1 Plaintiffs allege that Group 1 Defendants dramatically increased the prices for the Group 1 drugs and that the price increases were not correlated with similar changes in demand or manufacturing costs. They assert that no rational company selling a commodity product and acting alone would have implemented price increases consistent with the increases alleged in their complaints in the absence of changes in demand, production costs or other market factors. In particular, Group 1 Plaintiffs allege that MAC pricing, which acts as a ceiling for what a pharmacy may seek as reimbursement for a pharmacy benefits manager, limits the ability of a generic pharmaceutical manufacturer to unilaterally lead the market in a price increase absent collusion.[267] Ultimately, Group 1 Defendants may show they had legitimate economic reasons for their pricing decisions, as they argue in their briefs,[268] but Group 1 Plaintiffs are not required to rebut those reasons in order to withstand dismissal.[269]

### c.     Facts Implying a Traditional Conspiracy

In a concentrated, oligopolistic market, allegations of motive and actions against self-interest "may simply restate the (legally insufficient fact) that market behavior is interdependent

---

[267] *See* CB DPP Compl. ¶ 64 ("MAC pricing can penalize the generic drug manufacturer that raises price on its own when its competitors do not. A unilateral price increase in a competitive generic drug market that is subject to MAC pricing is likely to send buyers to a lower-price alternative. MAC pricing has little effect if generic drug manufacturers collectively increase their prices for a multi-source drug.").

[268] *See, e.g.*, DV Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 26 ("Plaintiffs do not provide any explanations as to why Defendants could not have independently set the observed prices.").

[269] *In re Propranolol*, 249 F. Supp. 3d at 721 ("At the motion to dismiss stage, . . . plaintiffs need not offer evidence that tends to rule out the possibility that the defendants were acting independently.") (internal quotation and citation omitted).

and characterized by conscious parallelism."[270]  Thus, the Court's determination of whether Group 1 Plaintiffs' plus factor allegations are enough to allow their complaints to withstand dismissal rests primarily on the third factor:[271]  whether they have sufficiently alleged facts implying the existence of a traditional conspiracy.[272]  "Evidence implying a traditional conspiracy consists of non-economic evidence that there was an actual, manifest agreement not to compete, which may include proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown."[273]  Here, Group 1 Plaintiffs assert that the existence of a traditional conspiracy is supported by their allegations regarding communications between Defendants at trade association meetings and other industry gatherings and their allegations regarding ongoing state and federal investigations into generic drug pricing.

### 1)  OPPORTUNITIES TO CONSPIRE

The Court finds that, with one exception, the Group 1 Plaintiffs have sufficiently alleged that the Group 1 Defendants had an opportunity to conspire.  Participation in trade organizations and their meetings "demonstrates how and when Defendants had opportunities to exchange information or make agreements."[274]  "While this information exchange, standing alone does not create an inference of an illegal agreement, . . . the fact of its existence indisputably facilitates

---

[270] *In re Ins. Brokerage*, 618 F.3d at 322 (*citing In re Flat Glass*, 385 F.3d at 360-61 ("In the context of parallel pricing, the first two factors largely restate the phenomenon of interdependence.")); *see also Valspar*, 873 F.3d at 193 ("[I]n the case of oligopolies the first two factors are deemphasized because they 'largely restate the phenomenon of interdependence.'") (*quoting In re Flat Glass*, 385 F.3d at 360).

[271] *See Schuylkill Health Sys. v. Cardinal Health 200, LLC*, No. 12-7065, 2014 WL 3746817, at *6 (E.D. Pa. July 30, 2014) ("the Court must focus primarily on the third factor").

[272] *In re Flat Glass*, 385 F.3d at 361.

[273] *In re Ins. Brokerage*, 618 F.3d at 322 (internal quotation marks omitted) (*quoting In re Flat Glass*, 385 F.3d at 361).

[274] *In re Processed Egg*, 821 F. Supp. 2d at 723 (internal quotation and citation omitted).

and supports an inference of an agreement."[275]  The pleadings set forth detailed allegations regarding Group 1 Defendants' representation on trade association boards along with allegations regarding their trade association memberships and meeting attendance.  Group 1 Plaintiffs allege that industry gatherings included representatives of Group 1 Defendants who had responsibility for setting drug prices, many of whom are identified by name in the Group 1 complaints.  These allegations are not merely conclusory.

More specifically, Actavis, Apotex, Dr. Reddy's, Heritage, Impax, Lupin, the Mylan Defendants, Par, Perrigo, the Sandoz Defendants, Sun, Taro, Teva, and Zydus are alleged to have belonged to relevant trade associations and their representatives are alleged to have participated to some degree on trade association boards and to have attended various industry meetings. Glenmark, the Hi-Tech Defendants, Lanett, West-Ward, and Wockhardt, while not alleged to have had trade association board representation, are each alleged to have belonged to at least one relevant trade association and to have had representatives in attendance at various industry meetings.  Group 1 Plaintiffs allege that through these interactions, Group 1 Defendants' representatives had occasion to connect with each other, to engage in strategic business discussions, and to gain awareness of their competitors' current and future business plans.[276]

While not all of these Defendants are alleged to have participated in industry activities to

---

[275]  *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1297 (M.D. Fla. 2016); *see also In re Blood Reagents*, 756 F. Supp. 2d at 632 ("common membership in trade associations, which, while not enough by itself to confer plausibility on an allegation of conspiracy, is yet another feature of the factual background"); *In re Flat Glass Antitrust Litig. (II)*, Civil Action No. 08-MC-180, 2009 WL 331361, at *3 (W.D. Pa. Feb. 11, 2009) ("While it is true that membership in trade associations, without more, does not in and of itself suggest a conspiracy, the meeting dates provide the Defendants with notice of specific time frames and manner of the alleged agreement and thus, dismissal based on the same is not warranted."); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1148 (N.D. Cal. 2009) (holding that to withstand dismissal, it was not necessary for plaintiffs to "identify who attended these meetings, what was discussed at them, or how they purportedly related to the conspiracy other than providing an opportunity for the parties to talk to one another") (internal quotation omitted).

[276]  *See, e.g.*, CB DPP Compl. ¶ 141. *Cf. In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789, 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage").

the same degree, Group 1 "Plaintiffs are not obliged to have the same quality or quantity of allegations as to one defendant as unto another."[277]  "[T]here is no requirement that allegations pertaining to one defendant mirror those against other defendants in terms of specific conduct or 'quantity' of alleged 'bad acts.'  Indeed, a defendant need not be accused of having engaged in all activities alleged to have advanced the conspiracy."[278]  "*Twombly* increased the burden antitrust plaintiffs must bear in order to satisfy Rule 8(a).  However, it does not require heightened fact pleading of specifics and expressly disclaimed an approach focusing on the probability that a complaint's allegations will ultimately be vindicated."[279]  While more specific detail regarding interfirm communications may be required for Group 1 Plaintiffs ultimately to prevail, their allegations regarding defendants' participation in industry groups and gatherings contribute to a finding that they have plausibly alleged that these Defendants had an opportunity conspire.

However, for one Defendant—Teligent—the Court concludes that the relevant Plaintiffs' allegations of an opportunity to conspire fall short of making plausible the contention that it had an opportunity to conspire with other Defendants.  As Teligent argues, it is not specifically alleged to have been a GPhA member.[280]  Nor is it alleged to have had board representation with any relevant trade association.  There are no allegations that Teligent representatives attended any industry-sponsored social gatherings.[281]  Econazole Plaintiffs allege that two specifically

---

[277] *In re Processed Egg*, 821 F. Supp. 2d at 732; *see In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13–CIV-7789 (LGS), 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("Questions as to each Defendant's participation in the conspiracy and the conspiracy's scope may be raised later in litigation, but do not merit dismissal at this phase.").

[278] *In re Processed Egg*, 821 F. Supp. 2d at 742.

[279] *In re Blood Reagents*, 756 F. Supp. 2d at 632 (internal quotation omitted).

[280] EC Teligent Mem. in Support of Mot. to Dismiss at 7; *see also* EC DPP Compl. ¶ 90 (acknowledging that Teligent is not a GPhA member); EC EPP Compl. ¶ 119 (alleging only that Perrigo was GPhA member).

[281] *See, e.g.*, EC DPP Compl. ¶¶ 117-20.

named Teligent representatives attended three meetings of one group,[282] and that unnamed

Teligent representatives attended six GPhA meetings.[283]  Viewed in the context of the timing of

Teligent's econazole price increases (which are alleged to have peaked several months after

those instituted by either Perrigo or Taro) and given the absence of any allegation that Teligent

has received a subpoena or has been specifically touched by a government investigation, the

Court finds that econazole Plaintiffs have not sufficiently alleged that Teligent had an

opportunity to conspire with the other econazole Defendants.  Econazole Plaintiffs' claims

against Teligent will be dismissed with leave to amend.

### 2)     GOVERNMENT INVESTIGATIONS

Group 1 Plaintiffs assert that their Sherman Act claims are also made plausible through

their allegations regarding the existence of multiple investigations into generic drug pricing.

They cite the Glazer and Malek guilty pleas resulting from the DOJ investigation as allegations

of evidence implying a traditional conspiracy.  Group 1 Defendants argue that the government

investigation and guilty plea allegations are not specific to the drugs implicated in the Group 1

complaints and are therefore insufficient to bolster Group 1 Plaintiffs' plus factor allegations.

More specifically, Group 1 Defendants argue that the DOJ investigation "has thus far

yielded charges as to conduct involving two products . . . ."[284]  The guilty pleas concern only

doxycycline and glyburide (a Group 3 drug.).[285]  Thus, clobetasol Defendants argue that "the

---

[282] *See id.* ¶¶ 99, 105, 111.

[283] *See id.* at ¶¶ 98, 103,104, 107, 109, 110.

[284] CB Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 23.

[285] *See* DX DPP Compl. ¶ 222.  Doxycycline Defendants contend that Plaintiffs have not specifically alleged that the doxycycline investigation related to Doxy RR and argue that "Plaintiffs cannot plead a Doxy RR conspiracy by pointing to allegations that concern Doxy DR . . . ." *See* DX Defs.' Mem. in Support of Mot. to Dismiss DX DPP Compl. at 17-18.

[clobetasol] DPP Complaint alleges that the DOJ investigation has yielded only guilty pleas by two individuals, employed by a company that is not a defendant in [the clobetasol] case, relating to two other drugs."[286] Doxycycline Defendants contend that "[n]either the transcripts from the guilty plea hearings, nor any other publicly available documents from the criminal proceedings, provide any specifics as to the companies or individuals with whom Malek and Glazer allegedly conspired, when the alleged conspiracies were formed, or the scope of any agreements."[287] They argue that absent specific information regarding the identity of other parties to the agreement to fix generic drug prices or the agreement's terms, the guilty pleas "reflect[ ] nothing more than guilt by association . . . "[288] and thus they cannot be used as "plus factors."

Group 1 Defendants are correct that "governmental investigations into conduct entirely separate from that alleged in the pleadings cannot support an inference of conspiracy."[289] But in the right circumstances, "government investigations may be used to bolster the plausibility of § 1 claims."[290] As one court has explained,

> it would be improper to draw a conclusion that a pending government investigation on its own supplies sufficient factual material to survive a 12(b)(6) motion to dismiss. However, it is perfectly permissible to take as true the fact that a government investigation has been instituted, and that therefore at least several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy.[291]

---

[286] CB Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 5.

[287] DX Defs.' Mem. in Support of Mot. to Dismiss DX DPP Compl. at 26.

[288] DX Defs.' Mem. in Support of Mot. to Dismiss DX DPP Compl. at 31.

[289] *In re Propranolol*, 249 F. Supp. 3d at 723 (*citing In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007)).

[290] *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 790 F. Supp. 2d 106, 115 (S.D.N.Y. 2011); *see also In re Blood Reagents*, 756 F. Supp. 2d at 632 (finding that "the existence of a parallel criminal investigation—an allegation demonstrating that the government believes a crime may have occurred" was sufficient to permit the a Section 1 claim to withstand dismissal when combined with allegations supporting the existence of other plus factors).

[291] *In re Packaged Seafood Prod. Antitrust Litig.*, No. 15-MD-2670, 2017 WL 35571, at *8 (S.D. Cal. Jan.

Therefore, Group 1 Plaintiffs contend that in determining whether their claims are plausible the Court may consider their government investigation and guilty plea allegations. They contend the Court can do so without regard to whether they specifically address the relevant pharmaceutical products because the allegations are probative of broadly anticompetitive conduct in the generic pharmaceutical industry. The Court agrees and finds that Group 1 Plaintiffs' allegations regarding ongoing federal and state investigations and the Heritage executives' guilty pleas are not "entirely separate" from the conduct alleged in the Group 1 complaints.[292]

Group 1 Plaintiffs allege that the markets for generic drugs share similar structural characteristics. More importantly they also allege that generic drug manufacturers, including Heritage and many of the Group 1 Defendants participated in overlapping trade industry groups and events.[293] Through these contacts, Group 1 Plaintiffs plausibly allege a web of connections between Heritage and other Group 1 Defendants that is sufficient to plead that the government investigations and the Glazer and Malek guilty pleas are not "entirely separate" from Group 1 Plaintiffs' claims pertaining to Group 1 drugs other than Doxy DR. Likewise they have alleged that Group 1 drugs beyond doxycycline have been implicated in the government investigations.

---

3, 2017) (finding that the Court could "validly consider the pending DOJ investigation in concert with Plaintiffs' other allegations" which included "allegations that several Defendants have admitted to receiving criminal subpoenas").

[292] *See In re Propranolol*, 249 F. Supp. 3d at 723 ("the former CEO and former president of defendant Heritage have pled guilty to fixing prices, and while their pleas do not concern Propranolol, they provide circumstantial evidence of motive, actions against interest, and interfirm communications"); *cf. In re Packaged Seafood*, 2017 WL 35571, at *7 ("The Court recognizes the limitations of and caution required in relying on a pending investigation to support the validity of an alleged conspiracy, but nonetheless agrees with Plaintiffs that a pending investigation may bolster additional allegations."); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 995 (E.D. Mich. 2014) (holding that the plaintiffs' allegations of "investigations and guilty pleas" regarding a single component were sufficient to "create an inference of an expansive industry-wide component parts conspiracy" where there were "allegations of involvement in related litigation")

[293] *In re Chocolate Confectionary*, 801 F.3d at 403 ("[I]f two markets are sufficiently similar or adjacent and the relevant activities therein are sufficiently linked or tied in some way, *e.g.,* the people involved in the conspiracies are the same or overlapping, it may be reasonable to use evidence of a foreign conspiracy to support an inference of a domestic conspiracy.")

Moreover, Group 1 Plaintiffs' complaints allege that many of the Group 1 Defendants have received subpoenas in either the DOJ or state AG investigation. Although there are no allegations that the Hi-Tech Defendants, Wockhardt, West-Ward, Teligent, Apotex, Glenmark or Lupin received subpoenas, there are allegations that at least one manufacturer of each of the Group 1 drugs—clobetasol, digoxin, divalproex ER, doxycycline, econazole, and pravastatin—has received a subpoena seeking information regarding their generic drug pricing practices. For purposes of Group 1 Defendants' motions to dismiss, Group 1 Plaintiffs have sufficiently alleged that there is a plausible link between the federal and state investigations, the alleged Doxy DR conspiracy, and Group 1 Defendants' conduct with respect to the other Group 1 drugs such that they may rely on the investigations and the guilty pleas as plus factors in support of their Sherman Act claims. [294] Whether the connections between the guilty pleas, the government investigations, and each Defendant will be proven on summary judgment is a question that remains, but more is not required to permit the Court to consider them at this stage of the litigation.[295]

---

[294] *See In re Propranolol*, 249 F. Supp. 3d at 723-24 (holding that while the Heritage executives' guilty pleas do "not concern Propranolol, they provide circumstantial evidence of motive, actions against interest, and interfirm communications" where the plaintiffs had alleged facts to "establish a plausible link between the conduct to which [they] plead guilty and the conspiracies alleged" in the Propranolol complaint)*; see also In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 2999269, at *7 (E.D. Mich. July 3, 2014) ("The factual allegations create 'a reasonable expectation that discovery will reveal evidence of illegal agreement' beyond those parties that have pleaded guilty and beyond the extent admitted by some Defendants."); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008) (finding that the plaintiffs' allegations regarding DRAM guilty pleas were sufficient to "support an inference of a conspiracy in the SRAM industry" where the plaintiffs alleged "the same actors associated with certain Defendants were responsible for marketing both SRAM and DRAM").

[295] Group 1 Plaintiffs also argue that their allegations of investor communications and industry commentary are "a plus factor supporting the plausibility of the existence of a conspiracy." DX DPP Opp. Br. at 35. Group 1 Defendants, not surprisingly, argue that these statements

> constitute nothing more than independent recognition that economic conditions have allowed individual companies to increase prices—a commonplace phenomenon that is frequently a topic of discussion in calls with analysts and investors and evidence, at most, of entirely legal "follow the leader" conduct, or generally bullish forecasts of the company's overall profitability.

### III.       GROUP 1 PLAINTIFFS HAVE PLED PLAUSIBLE SHERMAN ACT CLAIMS

Group 1 Plaintiffs' allegations are not mere "labels and conclusions," "allegation[s] of parallel conduct and . . . bare assertion[s] of conspiracy."[296]  After an assessment of the "plus factors," the Court concludes that with the exception of their claims against Teligent, Group 1 Plaintiffs have made sufficient allegations of evidence implying a traditional conspiracy to permit their Sherman Act claims to withstand dismissal.  The Group 1 Plaintiffs'

> complaints, while not answering all specific questions about "who, what, when and where," do put defendants on notice concerning the basic nature of their complaints against the defendants and the grounds upon which their claims exist. While viewing each of these factual allegations in isolation may lead one to the conclusion drawn by the defendants, i.e., that there is a legitimate business justification for each of the acts, a view of the complaint as a whole, which this Court must take, and accepting all of the factual allegations as true, does support a plausible inference of a conspiracy or agreement made illegal under § 1 of the Sherman Act.[297]

Ultimately, whether Group 1 Defendants' alleged pricing decisions were "simple, benign business decisions . . . or whether they represent concerted effort in violation of the Sherman Act are issues of fact which this Court cannot decide on the pleadings and which require discovery prior to resolution."[298]  With the exception of the motion to dismiss by Teligent, which will be granted, the Court finds that Group 1 Plaintiffs have pled plus factors which are sufficient to permit their Sherman Act claims to withstand dismissal.

---

DX Defs.' Mem. in Support of Mot. to Dismiss DPP Compl. at 21-22.  While some of the statements alleged in Group 1 Plaintiffs' complaints may be suggestive of a conspiratorial purpose or state of mind, many appear to be equally consistent with passive or reflective observations and opinions.  Ultimately, the Court declines to rely on these allegations in reaching its conclusion with respect to whether Group 1 Plaintiffs have sufficiently alleged a Sherman Act claim based on circumstantial evidence.

[296] *Twombly*, 550 U.S. at 555-56.

[297] *In re Se. Milk,* , 555 F. Supp. 2d at 943.

[298] *Id.* at 944.

## D.    ANTITRUST STANDING: EPP AND IRP SHERMAN ACT CLAIMS

Although the Court has concluded that Group 1 Plaintiffs have sufficiently alleged a violation of the Sherman Act, the Court also must determine whether they have antitrust standing to pursue such claims. Separate from Article III standing analysis, "[t]he antitrust standing inquiry seeks to determine whether the plaintiff is a proper party to bring a private antitrust action."[299] "To establish antitrust standing, a plaintiff must show that it has suffered an antitrust injury—that is, an injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."[300] "[T]here must be a causal link between the alleged injury and an antitrust violation's anticompetitive effects."[301]

Most Defendants argue that the Group 1 EPP and IRP federal (and state)[302] antitrust claims should be dismissed because Group 1 EPPs and IRPs only allege that they made indirect purchases of drugs with prices affected by the Defendants' alleged conduct and thus suffered injuries that are too remote to make them proper plaintiffs.[303] Their antitrust standing arguments

---

[299] *Animal Sci. Prod., Inc. v. China Minmetals Corp.*, 34 F. Supp. 3d 465, 499 (D.N.J. 2014) (internal quotation omitted); *see also Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 343 (3d Cir. 2018) ("Rooted in prudential principles, antitrust standing is distinct from Article III standing, which is rooted in the Constitution."); *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, No. 17-2910, 2018 WL 4224426, at *6 (7th Cir. Sept. 6, 2018) ("In the antitrust context, the proximate causation requirement in the past has been termed 'antitrust standing,' even though it has nothing to do with a plaintiff's standing to sue under Article III of the U.S. Constitution . . . .").

[300] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164 (3d Cir. 2017) (citation, internal quotation and alteration omitted).

[301] *Philadelphia Taxi Ass'n, Inc.*, 886 F.3d at 343.

[302] As with plaintiffs' other state law claims, the Court does not address state antitrust claims in this Opinion.

[303] *See* CB Defs.' Mem. in Support of Mot. to Dismiss CB EPP Compl. at 15-20; CB Defs.' Mem. in Support of Mot. to Dismiss CB IRP Compl. at 22; DG Defs.' Mem. in Support of Mot. to Dismiss DG EPP Compl. at 12-16; DG Defs.' Mem. in Support of Mot. to Dismiss DG IRP Compl. at 8-10; DV Defs.' Mem. in Support of Mot. to Dismiss DG EPP Compl. at 12-16; DV Defs.' Mem. in Support of Mot. to Dismiss DG IRP Compl. at 14-17. DX Defs.' Mem. in Support of Mot. to Dismiss DX EPP Compl. at 13-17; DX Defs.' Mem. in Support of Mot. to Dismiss DX IRP Compl. at 14-18; EC Defs.' Mem. in Support of Mot. to Dismiss EPP Compl. at 7-10; PV Defs.' Mem. in Support of Mot. to Dismiss PV EPP Compl. at 11-16; PV Defs.' Mem. in Support of Mot. to Dismiss PV IRP Compl. at 12-14. Econazole defendants do not raise the question of antitrust standing in their motion to dismiss

rely on the Supreme Court's decision in *Associated General Contractors of California, Inc. v. California State Council of Carpenters.*[304]  *Associated General Contractors* considered the claims of workers who wanted jobs at a construction project that allegedly had been halted due to an antitrust violation.  The Supreme Court ultimately upheld the dismissal of the workers' claims as being too remote, resting its analysis on principles of proximate cause.[305]  It explained that "Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."[306]

The Court of Appeals for the Third Circuit has recently summarized the *Associated General Contractors* test for antitrust standing as requiring consideration of the following five factors:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.[307]

Arguing for dismissal, Defendants contend that apportionment of damages between DPPs, EPPs, and IRPs would be economically complex given that there is competition at the wholesale and retail levels and that manufacturer discounts or other promotions also impact

---

econazole IRPs complaint.

[304] 459 U.S. 519, 535 (1983).

[305] *Id.* at 535-36 (noting "a similarity between the struggle of common-law judges to articulate a precise definition of the concept of 'proximate cause,' and the struggle of federal judges to articulate a precise test to determine whether a party injured by an antitrust violation may recover treble damages").

[306] *Id.* at 535 (quoting *Blue Shield of Va. v. McCready*, 457 U.S. 465, 477 (1982)).

[307] *In re:  Processed Egg Prods. Antitrust Litig.*, 881 F.3d 262, 269 (3d Cir. 2018).

pricing in the chain of distribution.[308]  However, in the context of the EPP and IRP Sherman Act

claims, it is important to note that the EPPs and IRPs seek only injunctive relief and not

monetary damages.[309]  As one court has explained, "the factors [*Associated General Contractors*]

identified that relate to *damages* are not relevant to standing to seek injunctive relief."[310]  To

determine whether EPPs and IRPs have sufficiently alleged a basis for antitrust standing the

Court need not weigh the fifth factor listed above (the potential for duplicative recovery or

complex apportionment of damages).[311]  Likewise, because Group 1 EPPs and IRPs do not seek

damages for their Sherman Act claims, "it is inconsequential that there are more 'immediate

---

[308] *See, e.g.*, DV Defs.' Mem. in Support of Mot. to Dismiss DV EPP Compl. at 15 ("Calculating damages for TPPs would require identifying overcharges to wholesalers and tracing those overcharges downstream through multiple levels in the distribution chain, then to TPPs who purchased and paid for some or all of the purchase price for one or more Divalproex prescriptions") (internal quotation omitted); *id.* at 16 ("There are so many variables that contribute to pricing decisions at different levels of the distribution chain that it would be exceedingly difficult, if not impossible, to isolate the portion of the retail price attributable to the alleged overcharge stemming from the claimed price-fixing conspiracy."); DV Defs.' Mem. in Support of Mot. to Dismiss DV IRP Compl. at 16 (IRPs' "dual role as indirect purchasers and resellers increases the economic complexity of apportioning damages. Calculating [IRPs'] damages would require not only identifying overcharges to wholesalers and tracing those overcharges to [IRPs] . . . but also determining the extent to which [IRPs] passed on those overcharges through the thicket of their reimbursement agreements with PBMs.").

[309] *See, e.g.*, CB EPP Compl. ¶ 249; CB IRP Compl. ¶ 240.  As indirect purchasers, EPPs and IRPs are barred from recovering monetary damages for their federal antitrust claims.  *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 366 n.2 (3d Cir. 2005) ("Illinois Brick determined that direct purchasers are the only parties 'injured' in a manner that permits them to recover damages.  It thus held that indirect purchaser plaintiffs do not have statutory standing to recover damages under Section 4 of the Clayton Act.").

[310] *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 813 (N.D. Ill. 2017) (emphasis added); *cf. In re Aluminum Warehousing Antitrust Litig.*, No. 13-MD-2481, 2014 WL 4277510, at *17-18 (S.D.N.Y. Aug. 29, 2014) (explaining that "[t]he *AGC* factors relating to complex, speculative and/or duplicative damages beg the question of whether and how that analysis changes in the context of actions in which only injunctive relief is sought" and concluding that "the AGC factors are reasonably applicable to actions in which only injunctive relief is sought"), supplemented, No. 13-MD-2481, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), and aff'd, 833 F.3d 151 (2d Cir. 2016).

[311] *See* CB EPP Opp. Br. at 21 arguing that their "claim for injunctive relief under Section 16 of the Clayton Act is not subject to the same *AGC* requirements because injunctive relief poses no risk of duplicative recovery"). (EPPs and IRPs argue that even if the Court were required to consider the potential for duplicative recovery or complex apportionment of damages, it is not a factor that weighs against finding they have antitrust standing because the overcharges they paid are traceable throughout the pharmaceutical supply chain.  For example, the Doxycycline IRPs argue that "[p]harmaceuticals are highly regulated, assigned unique product codes by manufacturer, and tracked by software all the way from the wholesaler to the pharmacy to the childproof bottle." DX IRP Opp. at 10.  However, this is not specifically alleged in the doxycycline IRPs complaint.

victims' of the [alleged] scheme. . . .  When damages are not at issue, as long as the plaintiffs' alleged injury is . . . directly attributable to the conspiracy, the injury satisfies *AGC*."[312]

The question for the Court then, is whether EPPs and IRPs have alleged injuries that are directly attributable to the conspiracy alleged in their Sherman Act claims or whether they have alleged a conspiracy that has only tangentially affected them.  EPPs and IRPs contend that they have sufficiently alleged a basis for antitrust standing because they have clearly alleged causation – they pay supracompetitive prices *because* Defendants conspired to fix the prices of the generic pharmaceuticals for which they paid.  As clobetasol EPPs argue, they have alleged that "when Defendants *raise* prices, End-Payers *pay* higher prices."[313]  Defendants argue that EPPs and IRPs have not sufficiently alleged a basis for antitrust standing because EPPs and IRPs are far removed from the manufacturers' pricing decisions, noting numerous links in the chain of distribution between Defendants and EPPs and/or the IRPs.[314]

To the extent that the Court has been asked to analyze the issue of antitrust standing on a motion to dismiss, the Court's analysis falls under the *Twombly/Iqbal* plausibility standard governing motions to dismiss under Rule 12(b)(6).  The Court is also mindful of the Third Circuit's caveat that "antitrust standing is more properly viewed as an element of an antitrust claim that can be resolved at summary judgment."[315]  At this stage of the litigation, the

---

[312] *In re Broiler Chicken*, 290 F. Supp. 3d at 814.

[313] CB EPP Opp. Br. at 22.

[314] *See, e.g.*, DG Defs.' Mem. in Support of Mot. to Dismiss DG EPP Compl. at 14 ("there are numerous links in the chain of distribution before digoxin ultimately reaches consumers, including transactions between manufacturers and wholesalers, wholesalers and distributors, and distributors and retail pharmacists"); DG Defs.' Mem. in Support of Mot. to Dismiss DG IRP Compl. at 9 ("as middlemen in the generic drug distribution chain, [IRPs] concede that they purchase digoxin from drug wholesalers, who impose a markup . . . , and that they on-sell digoxin to end-payer consumers – presumably at a markup as well . . . .").

[315] *In re Wellbutrin XL Antitrust Litig. Indirect Purchaser Class*, 868 F.3d 132, 164 (3d Cir. 2017); *see also Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 232 n.15 (3d Cir. 2013) (indicating that antitrust standing is a "merits issue"); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665,

allegations of the EPPs and the IRPs are sufficient to plead that they have suffered harm that is an "essential component of Defendants' anticompetitive scheme, as opposed to an ancillary byproduct of it."[316]  Further discovery is warranted before Defendants can show that the losses alleged by EPPs and IRPs are not "merely byproducts of the anticompetitive effects of the restraint[s]" alleged.[317]  The Court declines to dismiss the Sherman Act claims of the EPPs and IRPs for want of antitrust standing.

## III.  CONCLUSION

The Court will grant Teligent's motion to dismiss Group 1 Plaintiffs' Sherman Act claims because econazole Plaintiffs have not sufficiently alleged that it engaged in parallel conduct, and will do so without prejudice to econazole Plaintiffs' ability to seek the Court's leave to amend their claims against Teligent.  The Court otherwise concludes that Group 1 Plaintiffs' claims under Section 1 of the Sherman Act are sufficient to withstand dismissal and the motions to dismiss Group 1 Plaintiffs' Sherman Act claims will be denied.

An appropriate Order follows.

---

684 (E.D. Pa. 2014) ("'[T]he existence of antitrust injury is not typically resolved through motions to dismiss,' although courts can and do decide these issues at the 12(b)(6) stage.") (*quoting  Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 416–19 (3d Cir. 1997)); *Otsuka Pharm. Co. v. Apotex Corp.*, 143 F. Supp. 3d 188, 195 n.5 (D.N.J. 2015) ("the existence of antitrust injury involves complex questions of fact, ill-suited for resolution upon a motion to dismiss") (citation and internal quotation omitted).

[316] *Hanover 3201 Realty LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 173 (3d Cir. 2015).

[317] *Id.*